193 So. 633

**STATE v. MESSER.**

No. 35589.

Jan. 9, 1940.

Concurring Opinion Jan. 23, 1940.

Rehearing Denied Feb. 5, 1940.

Roland B. Reed and George L.Fontenot, both of Ville Platte, and A. H. Garland, of Opelousas, for defendant and appellant.

Lessley P. Gardiner, Atty. Gen., Edward M. Heath and James O'Connor, Asst. Attys. Gen., and E. Herman Guillory, Dist. Atty., and Atlee P. Steckler, both of Ville Platte, for the State.

LAND, Justice.

Defendant is indicted for the murder of LeRoy Barmore in the Parish of Evangeline on or about the 20th day of July, 1939.

The first trial of the case resulted in a mistrial. On the second trial, defendant was found by the jury "guilty as charged," and thereafter sentenced by the court to be hanged.

On appeal to this court, the errors complained of by defendant during the course of his trial are embodied in eight (8) bills of exceptions.

### Bill of Exception No. 1.

The State and defense having announced their readiness on the second trial, defendant, for the first time, moved to withdraw his plea of not guilty made on the first trial, for the purpose of filing a plea of insanity, both at the present time and at the time of the commission of the act.

The district attorney opposed the motion, on the ground that, during the first trial, no plea of insanity was filed by defendant and that, after the first trial, defendant had three weeks within which to file such plea but elected to wait until the date fixed for the second trial to interpose such plea, and on the further ground that this plea is frivolous and was filed solely for the purpose of delay.

The objections of the State were sustained by the trial judge for the following reasons stated in the per curiam to this bill: "The Court denied the motion of the defendant to withdraw the plea of not guilty, to file the plea of present insanity, but the Court permitted the plea of insanity at the time of the commission of the crime to be filed, but refused to appoint a commission of experts to inquire into the present mental condition of the accused or to

the mental condition of the accused at the time of the commission of the crime, and the Court announced to the defendant that it would permit evidence of expert or lay witnesses to be introduced on the trial of the case, by the defendant, to prove insanity at the time of the crime.

"Article 265 of the Code provides that the defendant, may, with the consent of the Court, withdraw the plea of not guilty and then set up some other plea. In the case of State v. Harville, 175 La. 458, 143 So. 373, the Supreme Court, in interpreting Article 265 of the Code of Criminal Procedure held that once a plea of not guilty is entered, it cannot be withdrawn for the purpose of filing some other plea, without the consent of the Court.

"The reason why the Court refused the defendant's motion to withdraw the plea of not guilty, and enter the plea of present insanity was because the Court did not believe that the defendant was presently insane, or that a trial should be held on the question of present insanity, for the reason that the Court had ample opportunity to examine and observe the defendant during the trial of the first case, some three weeks, before the trial of the present case, which resulted in a mistrial, and the Court observed that the defendant made a good witness for himself on his first trial, and stayed on the witness stand for approximately six (6) hours, and assisted his attorneys throughout the trial, and apparently understood very well everything that took place, and the Court further observed and talked to the defendant since the first trial, and particularly on the morning that the plea of present insanity was filed, and the Court found that the defendant at the time the plea was filed, apparently understood the case against him very well, and was able to assist in his defense the same as he had done during his first trial. The Court further understands that under the provisions of Article 267 of the Code of Criminal Procedure, the request made by an accused for the appointment of a commission of experts to inquire into the mental condition of the accused rests within the sound discretion of the Trial Court, and may be refused if the Court is not convinced that the accused may be presently insane.

"In the instant case, not only was the Court not convinced that the accused was presently insane, but the Court was convinced beyond a doubt that the accused was presently sane, and appeared to understand the proceedings against him, and to be able to assist his attorneys in his defense, and the Court further felt that the plea of present insanity was filed solely for the purpose of delay, and that it was unnecessary to appoint medical experts to inquire into the present insanity of the defendant. State v. Ridgway, 178 La. 606, 152 So. 306. State v. McManus, 187 La. 9, 174 So. 91.

"The Court refused to appoint medical experts to examine into the mental condition of the defendant at the time of the commission of the crime for the reason that the Court, after observing the defendant and hearing his testimony about his actions on the day of the killing, during the trial of the first case, and prior thereto,

personally feels and knows that the defendant could not have been insane at the time of the commission of the crime. The Court has personally known the defendant for a number of years, and had occasion to observe him in court at different times prior to the commission of the crime, and particularly, had the opportunity to observe the defendant in the trial of a civil case wherein the defendant was interested, and subsequently, had to sentence the defendant to the Parish Jail for contempt of Court, and the Court feels that the appointment of a lunacy commission to examine into the mental condition of the defendant as of the date of the commission of the crime, would simply cause unnecessary delay and expense, so the Court, in the exercise of its discretion refused to appoint medical experts to examine into the mental condition of the accused at the time of the commission of the crime. State v. Ridgway, 178 La. 606, 152 So. 306, State v. McManus, 187 La. 9, 174 So. 91.

"During the trial of the case, the defendant offered the testimony of numerous witnesses in an effort to prove that the defendant was insane or mentally unbalanced at the time of the commission of the crime, and the State rebutted this evidence by the introduction of testimony of witnesses who had talked to the defendant and had been in his company on the morning of the killing, and just prior thereto, and after the homicide took place, and all of these witnesses testified that the defendant appeared to be perfectly sane and normal at the time of the commission of the crime.

"The State further introduced the testimony of Dr. T. H. Littell, Coroner of the Parish, who testified that he had occasion to examine the defendant in jail after the commission of the crime, on different occasions up to the date of the trial, and that in his opinion, the defendant was perfectly sane and normal." Tr., pp. 19–21, inclusive.

In State v. Dawson, 186 La. 900, at pages 902 and 903, 173 So. 524, it is said by this court: "Article 265 of the Code of Criminal Procedure reads as follows:

" 'The defendant may at any time, with the consent of the court, withdraw his plea of not guilty and then set up some other plea or demur or move to quash the indictment.'

"This article of the Code leaves it to the sound discretion of the trial judge to permit the withdrawal of a defendant's plea of not guilty, which discretion should not be interfered with unless unreasonably or arbitrarily exercised."

█ Act No. 136 of 1932 repeals Articles 268, 269, 270, 271, 272 and 273 of the Code of Criminal Procedure, and amends and reenacts Article 267 of the Code. The pertinent parts of this article, as amended, are as follows: "Art. 267. If before or during the trial the court has reasonable ground to believe that the defendant, against whom an indictment has been found or information filed, is insane, or mentally defective, to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court shall immediately fix a time for a hearing to

determine the defendant's mental condition. The court may appoint two disinterested qualified experts in mental diseases to examine the defendant with regard to his present mental condition and to testify at the hearing. * * *

"Whenever, on a prosecution by indictment or information, the existence of insanity or mental defect on the part of the defendant at the time of the alleged commission of the offense charged becomes an issue in the cause, the court may appoint one or more disinterested qualified experts in mental diseases, not exceeding three, to examine the defendant. * * *

"The appointment of experts by the court shall not preclude the State or defendant from calling expert witnesses to testify at the trial, and in case the defendant is committed to custody by the court they shall be permitted to have free access to the defendant for purposes of examination or observation."

Whether a defendant pleads present insanity or insanity at the time of the commission of the offense, the language of the statute is that "the court may appoint" experts to examine the defendant, thereby leaving such appointment to the sound discretion of the court.

In State v. Ridgway, 178 La. 606, 152 So. 306, the trial judge overruled defendant's plea of present insanity and refused to appoint a commission of experts to determine his mental condition.

In the opinion in that case, this court said, 178 La. at pages 607, 608 and 609, 152 So. at pages 306 and 307: "Defendant's plea, accompanied by the affidavits of his mother and his aunt, was filed on the day of the trial. The trial judge assigns as his reason for overruling the plea and declining to appoint experts to examine defendant: 'That no evidence was submitted or offered which would cause the court to believe defendant might be insane.'

"Act No. 136 of 1932 amends and re-enacts article 267 and repeals articles 268, 269, 270, 271, 272, and 273 of the Code of Criminal Procedure, and is the statute governing pleas of insanity at the present time.

"The statute (section 1) reads in part as follows, viz.: 'If before or during the trial the court has reasonable ground to believe that the defendant, against whom an indictment has been found or information filed, is insane, or mentally defective, to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court shall immediately fix a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested qualified experts in mental diseases to examine the defendant with regard to his present mental condition and to testify at the hearing.'

"The clear purpose of the law is to make effective the humane principle that no person while insane can be tried and punished for a criminal offense. But it was never intended that the trial on the issue of guilt or innocence shall be delayed simply because the defendant seeks to avoid trial on the ground that he is presently insane.

"Under the express terms of the statute, the trial judge is not required to order an inquiry into the mental condition of the defendant unless he has reasonable ground to believe that defendant is insane. But defendant's assertion that he is insane, or even the affidavits of witnesses that they do not consider defendant is mentally sound, are not of themselves sufficient to create such belief in the mind of the trial judge. The question is one that addresses itself to the sound discretion of the court. Reasonable ground to believe that the defendant is insane can only arise in the mind of the trial judge when information to that effect is furnished from a trustworthy source or by credible parties, or when from the inspection or observation of the court, itself, defendant appears to be mentally unbalanced.

"In this case, neither the information furnished nor his personal observation of the defendant, himself, created any reasonable ground of belief in the mind of the trial judge that defendant was not presently sane, and he, therefore, found it unnecessary and inexpedient to order a hearing to determine defendant's mental condition.

"After reading the affidavits of defendant's mother and maternal aunt filed in support of his plea of present insanity, and considering the fact that defendant was under the personal observation of the trial judge, we are unable to say that the case is one in which the court should have ordered an inquiry into the sanity or insanity of the defendant.

"For the reasons assigned, the conviction and sentence herein appealed from are affirmed."

In State v. McManus, 187 La. 9, 174 So. 91, State v. Ridgway, 178 La. 606, 152 So. 306, is cited with approval by this court.

Under the authority of the decisions of this court, cited supra, the trial judge properly refused in the instant case to order a hearing on the question of the present insanity of the defendant and to appoint a lunacy commission to inquire into the present insanity of the defendant.

It follows, necessarily, that the trial judge did not abuse the discretion vested in him in refusing to allow defendant to withdraw the plea of not guilty on the morning of the second trial, and substitute therefor a plea of present insanity.

■ (2) The court permitted the plea of insanity as of the date of the commission of the crime to be tried before the jury and evidence of lay and expert witnesses to be adduced on this plea, but refused to appoint a lunacy commission to inquire into the insanity of defendant as of the date of the commission of the crime.

Article 267 of the Code of Criminal Procedure, as amended by Act No. 136 of 1932, does not make it the mandatory duty of the trial judge to appoint a commission of experts to examine a defendant when the existence of insanity on his part at the time of the alleged commission of the offense charged becomes an issue in the case. But, in such case, the act specifically provides that "the court may appoint one or more disinterested qualified experts in mental diseases, not exceeding three, to examine the defendant," thereby leaving the

appointment of a commission of experts to the sound discretion of the trial judge.

In the present case, the trial judge has personally known defendant for a number of years and has had occasion to observe him in court at different times prior to the commission of the crime. After hearing the testimony of numerous witnesses, offered by defendant before the jury to prove insanity at the time of the commission of the offense, and the rebuttal testimony of the State's witnesses, who had talked to defendant and had been in his company on the morning of the killing, just prior thereto, and after the homicide took place, the judge a quo declares in the per curiam to this bill that he "personally feels and knows that the defendant could not have been insane at the time of the commission of the crime," and that the appointment of a lunacy commission to examine into the mental condition of the defendant at the time of the commission of the offense would simply cause unnecessary delay and expense. So the court, in the exercise of its discretion, refused to appoint a lunacy commission in the case. In our opinion, the court below did not abuse its discretion in so doing.

### Bill of Exception No. 2.

■ This bill was reserved by defendant to the overruling by the trial judge of challenges for cause of two jurors.

The per curiam to this bill states that: "After the State had examined the two prospective jurors, Nat Guillory and Clabe Rabb on their voir dire, and had accepted these jurors, the defendant challenged the two prospective jurors, Nat Guillory and Clabe Rabb for cause, on the sole ground that at the former trial of the defendant, for the same offense, but at a different term of Court, which trial had resulted in a mis-trial, these two jurors had been examined as prospective jurors and had been challenged peremptorily by the defendant.

"The Court refused to sustain the challenge for cause by the defendant, on the ground first, that the defendant had twelve (12) peremptory challenges left at the time of the challenge, and on the further ground that the jurors qualified themselves for jury service in that on their voir dire examination, they stated that they knew nothing about the facts or the evidence in the case; that they were not related to either the defendant, or to the deceased, and that they had a free and open mind, and if accepted as jurors, they could enter the jury box with an open mind and restrict themselves to the evidence offered in the case. These two prospective jurors further stated positively that although they had been summoned for jury service on the first trial of the defendant, and had been examined on their voir dire, and had been peremptorily challenged by the defendant, that this would not influence them in any way, or cause them to be prejudiced against the defendant or his attorneys, or against the State.

"The Court based its ruling on Article 351 of the Code of Criminal Procedure which sets out the causes for which a juror may be challenged, and as none of the causes set out in said Article 351

existed as to these two jurors, and as said jurors had qualified themselves as competent jurors, and as the Court knows said two prospective jurors, personally, and knows them to be men of high reputation in their communities, the Court considered these two jurors could not be challenged for cause. The Court further based its ruling on Article 353 of the Code of Criminal Procedure, which provides that the defendant cannot complain of any ruling sustaining or refusing to sustain a challenge for cause unless his peremptory challenges have been exhausted, or unless defendant, by such ruling, would be forced to accept an obnoxious juror. After the ruling of the Court, the defendant challenged the two jurors peremptorily."

Defendant admits in his bill of exceptions, reserved to the ruling of the court, that he had not exhausted any of his twelve peremptory challenges, at the time his challenge for cause of the two jurors was made and was overruled by the trial judge.

Although defendant states in his bill that thereafter he exhausted all of his challenges, he does not pretend in his bill that he was forced to accept an obnoxious juror, as he is required to show under the decisions of this court. State v. Addison, 134 La. 642 at page 651, 64 So. 497; State v. Creech, 38 La.Ann. 480; State v. Woods, 112 La. 617, 622, 623, 36 So. 626.

The ruling of the trial judge refusing to sustain the challenge for cause by defendant of the two jurors in this case is clearly correct. The mere fact that these two jurors, on the former trial of this case, had been examined on their voir dire as prospective jurors and had been challenged peremptorily, does not disqualify them as jurors, nor are they incompetent on any other ground set forth in Article 351 of the Code of Criminal Procedure relative to the competency of jurors.

There are only three grounds in Article 351, relative to prior service of a juror, which disqualify him for service thereafter on a petit jury. These grounds are: "3. That the juror served on the grand jury which found the indictment, or on a petit jury which once tried the defendant for the same offense, or on the coroner's jury that investigated the homicide charged against the accused."

### Bill of Exception No. 3.

This bill was reserved by the defendant to the overruling by the court of his objection to the introduction of five photographs of the deceased.

In the per curiam to this bill, the trial judge states that: "The defendant objected to the introduction of five photographs of the deceased made by an expert photographer a short while after the body was found and before the body had been moved or touched by any one, on the ground that the pictures were immaterial to the case, and that the introduction of these pictures would simply serve to prejudice the jury, and for the further reason that the pictures were made out of the presence of the accused.

"The Court allowed these pictures of the deceased to be introduced in evidence, on the ground that these pictures were

made by an expert photographer, and were introduced by the State for the purpose of proving the 'corpus delicti', and for the purpose of assisting the witnesses in their testimony, and to assist the jury in better understanding the nature of the wounds of the deceased. The Court understands the law to be well settled that photographs are admissible in evidence when they are shown to have been accurately taken and to be clear impressions of the subject in conflict, and where they tend to illustrate any material fact in the case, or to shed light upon the transaction before the Court or Jury. See Wharton's Criminal Evidence, Eleventh Edition, Volume Two, Section 773.

"The defendant had ample opportunity to cross examine the expert photographer who was placed on the stand to identify the photographs and did cross examine said photographer at length, and the Court was satisfied that photographs offered in evidence were correct representations of the dead man, a short while after he was found dead in the woods."

The trial judge cited, as authority for his ruling, Wharton's Criminal Evidence, Eleventh Edition, Volume Two, Section 773, which provides: "Photographs. * * Stated as a general rule, the proposition is that photographs are admissible in evidence when they are shown to have been accurately taken, to be correct representation of the subject in controversy, and where they tend to illustrate any material fact in the case, or to shed light upon the transaction before the court.

"Whether the photograph is sufficiently identified as a correct representation of the subject it is meant to portray is a matter to be decided by the trial court. The fact that photographs are enlargements does not necessarily make them distortions and hence inadmissible. The admissibility of a photograph does not depend on its verification by the photographer provided it is shown to be an accurate representation by anyone competent to speak from personal observation. The fact that a photograph was not taken by a professional photographer does not render it inadmissible."

We do not find any error in the ruling of the court in admitting the photographs in question in evidence.

### Bill of Exception No. 4.

This bill was reserved by the defendant to the ruling of the trial judge on the objection of defendant to the testimony of the State's witness, Dan W. Wilson.

The trial judge states in his per curiam to this bill: "The defendant objected to the testimony of Dan W. Wilson, who was placed on the stand by the State, to testify as to the location of the land where the deceased's body was found, and where the homicide took place, on the ground that the witness was not a licensed surveyor or civil engineer. This witness was examined at length by both the State and the defendant, and from his testimony, it appears that this witness had had 30 years of experience in the location of lands, and in running lines, and in the operation of surveyor's instruments, and that he had qualified as an expert in land matters and in the location of lands,

in numerous trials, before this court, and other courts, and the Court has personally known the witness for a number of years, and known him to be regarded as an expert in land matters and in the location of lines, etc., and for that reason, the Court overruled the objection of the defendant, and permitted the witness to testify as to the location of the place where the crime was committed.

"The witness further testified that he was shown the exact spot where the homicide took place. and where the body was found by the two eye witnesses to the homicide."

We find no merit in this bill. The ruling of the trial judge is correct.

### Bill of Exception No. 5.

▮ This bill was reserved to the admission of the confession of defendant in evidence.

It is stated by the trial judge in the per curiam to this bill that: "The defendant objected to the introduction of a confession made by the defendant to the District Attorney and the Sheriff on the date of the homicide, on the ground that the confession was obtained from the accused immediately after he was arrested, and for the further reason that the defendant was mentally unbalanced at the time of giving the confession.

"The District Attorney and the Sheriff both took the witness stand to lay the proper foundation for the introduction of the confession, and they both testified that the confession was made by the defendant to the District Attorney of his own free will, and without any promises or threats of any kind, and after the defendant had been warned by the District Attorney that anything that he would say could be used against him in Court. The District Attorney and the Sheriff further testified that before the confession was signed by the defendant, it was read to him by the District Attorney, and then handed to the defendant who read the same, and after the defendant was satisfied that the confession was correct, he so said, and placed his signature to the confession, and also to a statement or certificate showing that the confession was free and voluntary and made without any promises of reward or threats of any kind. The District Attorney and the Sheriff further testified that at the time the confession was given by the defendant, that he appeared to be in full possession of his mental faculties, and appeared to be of sane and sound mind, and normal in all respects; that they had both known the defendant for a number of years, and he appeared to be natural in all respects, with the exception that defendant appeared to be sorry for what he had done, and realized that he had committed a horrible crime.

"The defendant did not offer any evidence to show that the confession had not been given free and voluntary, and failed to offer any evidence to show that the defendant was insane or mentally unbalanced at the time that he made the confession.

"The Court permitted the confession to be introduced in evidence, for the reason

that it was affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises, which are conditions precedent to the introduction of a confession as set out in Article 451 of the Code of Criminal Procedure, and on the further ground that it was affirmatively shown at the time of the giving of the confession, the defendant was of sane and normal mind, and mentally balanced.

"Furthermore, during the first trial of the defendant, which resulted in a mistrial, the defendant had taken the stand in his own behalf and had admitted that this identical confession offered by the State had been given by him to the District Attorney of his own free will, and that he had not been threatened or made any promises, and that he had signed the same, after the District Attorney read it to him, and after the same had been handed to him for examination."

The confession is shown to have been free and voluntary, and that defendant was sane at the time the confession was made. The objection to the admission of the confession was therefore properly overruled.

The confession made by defendant to the District Attorney and the Sheriff on the afternoon of July 20th, 1939, is found at page 62 of the Transcript and is as follows: "I am making the following statement or confession to Mr. E. Herman Guillory and Mr. Charley Pucheu, of my own free will, without any promise of reward or remuneration or without any threats of any kind, but simply to tell the truth of how I shot and killed LeRoy Barmore this morning. I am of sane and sound mind and know what I am doing.

"I went to Lecompt, Louisiana this morning and returned to my home at about the hour of 10:00 o'clock in the morning. After I got home I heard some one cutting wood near my home and I thought it was LeRoy Barmore and his workers cutting wood. So I got my shot gun that was already loaded with No. 8 bird or squirrel shot. This was a single barrel shot gun that holds two cartridges. I walked out in the woods to where I heard the cutting. I first saw an automobile that was parked in the road near by and recognized it as the automobile of LeRoy Barmore. I walked to where the men were cutting and when I got to within about 40 steps of the men I recognized Mr. Barmore sitting on a log and Mr. Chaddrick and Mr. Pruitt were underbedding a big pine tree near by. Mr. Barmore had no coat on and I didn't see any gun or other weapon upon him. When I got close to the men, Mr. Barmore turned around and saw me with my shot gun and he said 'Don't shoot' and he fell off the log and began running away. After he got up and began running away I shot him and I thought that I had missed him and so he kept on running and I shot him again and then he hollowed and ran on about 50 yards and then fell down. I went up to where he was laying and I really didn't think I had killed him and he didn't speak but was only grunting. I then asked him if he wanted water and he didn't answer but

only grunted. I then went back to my house to get some water and when I returned with the water I found him to be dead. I then went back home and told my boy Earnest what I had done and told him that I was sorry.

"Soon ·afterwards some people came to the place where Barmore was lying dead and were looking for the body. I was hiding in bushes close by. Soon afterwards I saw when the District Attorney and the Sheriff arrived.. I stayed hidden there about 40 minutes and then went to my house. Sometime afterwards the Sheriff came to my house and I surrendered to him."

### Bill of Exception No. 6.

 This bill was reserved by defendant to the ruling of the trial judge sustaining the objection of the State to a question asked the sheriff on the witness stand.

The per curiam to this bill is as follows: "While the Sheriff was on the witness stand, testifying relative to the manner in which the confession had been given by the defendant to the District Attorney and to his mental condition at the time of the giving of his confession, he was probed at length by the defendant, and the State objected to the defendant asking the Sheriff the following question: 'Was not your office rung up on one occasion to arrest or assist in subduing this man at Turkey ·Creek?'

"The State objected to the question on the ground that it had nothing to do with the confession, and on the further ground that the sole matter before the Court at the time was the sanity or insanity of the defendant at the time that the confession was given.

"The Court sustained the objection of the State to this question for the reason that the defendant by this question was seeking to elicit from the Sheriff that at some prior time to the homicide and to the giving of the confession that the Sheriff had been called upon to arrest defendant or assist in subduing him. The Court felt that the question was objectionable on the ground that it was immaterial and irrelevant to the matter before the Court, and that it was an attempt on the part of defendant to show occurrences or specific acts at some time long prior to the giving of the confession, and had no bearing on the sanity or insanity of the defendant, at the time that the confession was given. However, the Court permitted the defendant to probe the Sheriff at length with respect to the mental condition of the defendant at the time that the confession was given."

The ruling of the trial judge is correct.

### Bill of Exception No. 7.

 In the bill reserved by defendant it is stated that A. H. Garland, counsel for defense, and a witness for defendant, was presented "with a document purporting to be an abstract of the NW ¼ of SW ¼ of Section 5," and was asked if he had had occasion to look over this abstract. The witness answered, "Yes, I have," and thereupon the State objected to the question on the ground that the document is not an abstract of title but consists of various

certified copies of acts of conveyance, which objection was sustained by the court and the testimony excluded.

In the per curiam to this bill, the trial judge states: "The State objected to the form of the question on the ground that the documents were not an abstract of title, but were various certified copies of acts of conveyances. The Court sustained the State's objection for the reason that the form of the question was improper as the documents presented to the witness was not an abstract of title, but simply certified copies of deeds as correctly stated by the State.

"The witness answered the question before the State could make the objection, and although the Court sustained the State's objection, the witness' answer went to the jury, and the Court cannot see how the defendant could be prejudiced in any way by the Court's sustaining the objection of the State to the form of the question."

Counsel for defendant cannot be permitted, in asking a question of defendant's witness, to assume that various certified copies of conveyances are "a document purporting to be an abstract of title," when such certified copies are not so in fact. The form of the question was objectionable, and the ruling of the trial judge is correct.

### Bill of Exception No. 8.

 In the per curiam to this bill the trial judge states that: "A. H. Garland was placed on the stand by the defendant for the purpose of giving an opinion on a certain chain of title introduced by the State to land where the homicide took place. The witness was asked the following questions: 'Q. Do you see any missing links in the chain of title from these documents offered by the State? A. Yes, sir. Q. What is that link? A. It is the most important link, and that is the Act of Congress of 1871 and 1877.' At this time the State objected to this line of questioning on the ground that this witness could not testify as to what, in his opinion was required to make a legal title to a tract of land, and on the further ground that it was immaterial to the issues in the case.

"The Court sustained the objection by the State on the ground first, that the question as to the title of the land where the homicide took place was not relevant to the issues of the case, and on the further ground that the written documents introduced by the State spoke for themselves, and that a witness could not give his opinion as to what was necessary to form a good title to land."

The sole defense urged by defendant in this case is that he was insane at the time of the commission of the homicide. It is, therefore, immaterial whether defendant had a good title to the land or whether deceased, or any of those who were with him and who were engaged in cutting wood on the land, had a legal and just title to the same.

Even if defendant, on the trial, was proven to be sane at the time of the homicide, there is no issue of self-defense raised in this case. Even if defendant, on

the trial, had contended that the land belonged to him, and that he acted in self-defense in protecting his property against trespassers, his title to the property would be no protection to him in the case, when the circumstances under which he killed deceased, as detailed in his confession, are considered.

In State v. Ciaccio, 163 La. 563, 112 So. 486, the defendant was prosecuted for murder of the deceased while removing a line fence in dispute, and pleaded self-defense.

In the cited case it is said, 163 La. at pages 570 and 571, 112 So. at page 489: " 'A bare trespass against or upon the real property of another, not his dwelling, does not warrant the owner in using a deadly weapon in its defense, and, if he does and kills the trespasser, it is murder, though the killing is actually necessary to prevent the trespass. Thus a homicide, committed with a deadly weapon in order to prevent the removal of a line fence in dispute, is murder in the absence of proof that would tend to rebut the presumption of malice arising from the use of such weapon. * * A person in possession of realty, however, is justified in using all necessary force to defend his possession and eject trespassers, though his purpose in using force must be to put the trespasser off, and not to do him great bodily harm.' Wharton on Homicide (3d Ed.) p. 786, § 528."

We find no error in the ruling complained of by defendant.

## Motion for New Trial.

Defendant filed a motion for new trial on the grounds:

First. That the court erred in refusing the appointment of a lunacy commission to determine the mental condition of the accused on the day of his trial, and at the time of the commission of the offense.

Second. That the court erred in permitting the introduction of photographs of the dead man.

Third. That the court erred in refusing to permit the defendant's witness, A. H. Garland, to give an opinion on the title of the land where the body was found.

Fourth. That the court erred in overruling challenges for cause of the two jurors, Nat Guillory and Clabe Rabb.

The motion for new trial was overruled by the trial judge. As all of the grounds for new trial have already been passed upon in this opinion adversely to the contentions of defendant, it is not necessary to review these matters further.

## Motion in Arrest of Judgment.

The ground of this motion is: "That the Court erred in refusing to hold a hearing to determine the insanity of the accused at the time of the trial, as prayed for by defendant's counsel by a written application, which error is patent on the face of the record, and because no judgment against him, the said Theophilus Messer, can be lawfully rendered on said record."

The motion in arrest of judgment was overruled by the trial judge, and the grounds of the motion have already been passed upon in this opinion adversely to the contentions of defendant.

For the reasons assigned, the conviction and sentence appealed from by defendant are affirmed.

O'NIELL, C. J., concurs and hands down reasons.

O'NIELL, Chief Justice (concurring).

I concur in the decree affirming the verdict and sentence in this case because I do not find in the proceedings any error that would justify a setting aside of the verdict and sentence. But I do not subscribe to all that is said in the statements per curiam on the bills of exception. For example, the statement of the judge, in giving his reasons for refusing to appoint experts to examine into the mental condition of the defendant at the time of the homicide, that he, the judge, knew the defendant personally for a number of years and had had occasions to observe his mental condition, and therefore knew that he could not have been insane at the time of the homicide, is a matter which we have no means of considering, and which should not have been considered by the district judge.

Referring to bill of exception No. 2, it is sufficient to say that inasmuch as the challenge of the two prospective jurors for cause was not for a legal or sufficient cause the judge was right in overruling the challenge. But the fact that the defendant then had twelve peremptory challenges left, and the fact that he did not complain afterwards of having to accept an objectionable juror, had nothing whatever to do with the judge's reason or reasons for overruling the challenge of the two prospective jurors for cause.

Referring to bill of exception No. 4, I do not believe that the testimony of the State's witness, Dan W. Wilson, who was not a surveyor or civil engineer, would have been admissible as an opinion of an expert if the exact location of the spot where the dead body was found had been a material issue in the case; but it does not appear that the exact location of the dead body was an issue in the case, or was at all important; hence the ruling on the admissibility of the testimony of the witness, Wilson, was harmless.

Referring to bill of exception No. 8, I concur in the ruling of the district judge, sustaining the State's objection to the testimony of the attorney, A. H. Garland, concerning the title to the land on which the homicide occurred, on the ground that the matter was immaterial and irrelevant; but I do not agree that the witness, being an attorney at law, was not qualified to give an expert opinion on land titles.