15 So.2d 870

STATE v. ALLEN.

No. 37297.

Nov. 8, 1943.

O. J. Mestayer, of New Iberia, for relator.

L. O. Pecot, of Franklin, and Lawrence P. Simon, of New Iberia, for respondents.

ODOM, Justice.

Relator was indicted and tried for the crime of murder. He was convicted as charged and sentenced to death. He appealed to this court, and the conviction and sentence were affirmed. State v. Allen, 203 La. 1016, 14 So.2d 821.

On August 6, 1943, the Governor issued a warrant directed to the sheriff of Iberia Parish, where relator was convicted and sentenced, directing him to carry out the sentence and judgment of the court by electrocuting relator on August 31, 1943. Thereafter, counsel for relator made application to the trial judge for the appointment of a lunacy commission to determine relator's then mental condition, alleging that, since his trial, conviction, and sentence, relator had become insane. Counsel alleged in his application that he could prove by the sheriff, the coroner, the jailer, and a certain named inmate of the jail that relator was then insane and incapable of understanding the proceedings against him. Counsel attached to his application an affidavit made by relator's mother, in which she stated, in substance, that during his

childhood relator was always nervous and an "extraordinary child"; that during his youth his most noticeable trait was "movement, never satisfied, restless and impatient"; that in doing his school work he was never able "to do it at one time, tearing up papers in fits, and always overimpatient to accomplish anything he attempted"; that her greatest care was to "help calm him, holding him down to the things necessary for a normal life", and that those conditions and traits remained during his lifetime. The affidavit sets out further "That a cousin, Walter Polk, was treated for insanity and died in the county house under those conditions in Charlotte, North Carolina. That another cousin, Elva Dunham Wallace, also was treated for insanity, dying under those conditions in the State Hospital, at Columbia, South Carolina".

The trial judge ordered a hearing on relator's application and, after hearing the testimony of the witnesses called, and after personally observing the actions and conduct of relator, and after considering the affidavit made by relator's mother, refused to appoint disinterested experts in mental diseases to examine relator. Thereupon counsel for relator applied to this court for writs of certiorari, prohibition, and mandamus, which were granted.

The sole question presented, therefore, is whether the trial judge erred in refusing to appoint two disinterested qualified experts in mental diseases to examine the defendant with regard to his present mental condition.

One who has been convicted of a capital crime and sentenced to suffer the penalty of death, and who thereafter becomes insane, cannot be put to death while in that condition. Act 261 of 1918; State ex rel. Paine v. Judge, 49 La.Ann. 1500, 22 So. 738; State v. Migues, 194 La. 1081, 195 So. 545; State v. Cannon, 185 La. 395, 169 So. 446; State v. Burnham, 162 La. 737, 111 So. 79.

Article 267 of the Code of Criminal Procedure, as amended by Act 136 of 1932, page 449, is applicable to, and governs, pleas of insanity in all criminal matters. That article of the Code, as amended, reads, in so far as it need be quoted here, as follows: "If before or during the trial the court has reasonable ground to believe that the defendant, against whom an indictment has been found or information filed, is insane, or mentally defective, to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court shall immediately fix a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested qualified experts in mental diseases to examine the defendant with regard to his present mental condition and to testify at the hearing."

By its specific terms, this article of the Code, as amended, relates to proceedings "before or during the trial" and before conviction, and prescribes the rule to be followed by the trial judge "to determine the defendant's mental condition". It says nothing about the proceedings to be followed in a case where a person becomes

insane after conviction and sentence. But, for the same reason that a person is entitled to a hearing before conviction on the question of his sanity, he is entitled to a hearing after conviction; and the same rules of procedure govern.

It will be observed that Article 267 of the Code of Criminal Procedure, as amended, provides that, if before or during the trial "the court has reasonable ground to believe that the defendant * * * is insane, or mentally defective", the court shall immediately fix a time for hearing "to determine the defendant's mental condition", and that "The court may appoint two disinterested qualified experts in mental diseases to examine the defendant with regard to his present mental condition and to testify at the hearing".

On relator's application for the appointment of a lunacy commission, the trial judge "immediately" fixed a time for a hearing "to determine the defendant's mental condition", and summoned to appear before him the witnesses by whom counsel for relator alleged that he was "prepared to prove" that relator was then insane. After personally observing relator, after hearing the witnesses, and after considering the affidavit made by relator's mother, the judge refused to appoint two disinterested qualified experts in mental diseases to examine the defendant with regard to his present mental condition. Relator's present complaint is grounded upon the refusal of the trial judge to appoint the experts. The trial judge says in his return that he declined to appoint the experts because, after personally observing the acts and conduct of relator and after hearing the testimony of the witnesses called, he had no "reasonable ground to believe" that relator was insane.

In the case of State v. Ridgway, 178 La. 606, 152 So. 306, decided by this court on November 27, 1933, about a year after the adoption of Act 136 of 1932, which act amended Article 267 of the Code of Criminal Procedure, the defendant appealed from his conviction and sentence for the crime of burglary. His complaint was that the trial judge overruled his plea of present insanity and refused to appoint a commission of experts to determine his mental condition. The reason assigned by the trial judge for overruling the plea and declining to appoint experts to examine defendant was "That no evidence was submitted or offered which would cause the court to believe defendant might be insane".

In that case, this court, through its organ, Justice Rogers, said: "Under the express terms of the statute, the trial judge is not required to order an inquiry into the mental condition of the defendant unless he has reasonable ground to believe that defendant is insane. But defendant's assertion that he is insane, or even the affidavits of witnesses that they do not consider defendant is mentally sound, are not of themselves sufficient to create such belief in the mind of the trial judge. The question is one that addresses itself to the sound discretion of the court. Reasonable ground to believe that the defendant is insane can only arise in the mind of the trial judge when information to that effect is furnished from a trustworthy source or by credible

parties, or when from the inspection or observation of the court, itself, defendant appears to be mentally unbalanced."

The ruling made in the Ridgway case was reaffirmed and followed in the cases of State v. McManus, 187 La. 9, 174 So. 91, and State v. Messer, 194 La. 238, 193 So. 633, 637.

In State v. Messer, it was pointed out that Article 267 of the Code of Criminal Procedure, as amended by Act 136 of 1932, "does not make it the mandatory duty of the trial judge to appoint a commission of experts to examine a defendant when the existence of insanity on his part at the time of the alleged commission of the offense charged becomes an issue in the case". The court said: "But, in such case, the act specifically provides that 'the court may appoint one or more disinterested qualified experts in mental diseases, not exceeding three, to examine the defendant,' thereby leaving the appointment of a commission of experts to the sound discretion of the trial judge." The ruling announced in the Ridgway case and followed in the McManus and Messer cases is in accord with the jurisprudence which prevails throughout this country.

In the case of People of State of New York v. Esposito et al., 287 N.Y. 389, 39 N.E.2d 925, 142 A.L.R. 956, it was held that it was within the discretion of a trial court in a criminal prosecution, upon motion by defendant under statute for an examination into his sanity and for the employment of a psychiatrist to testify in his behalf, to enter a preliminary order committing the defendant for a reasonable

period for treatment and observation, with the view of determining whether there is any reasonable ground for doubting his sanity so as to justify a formal examination into the question. In a voluminous note following this case as published in A.L.R., the annotator, under the heading "Discretion of Court", says: "In the absence of a statutory provision to the contrary, the granting or denial of an investigation of the present sanity of the accused to determine whether he shall be put on trial, or whether his trial shall continue, is within the sound discretion of the trial court."

In support of this general rule, there are cited one Federal case and cases decided by the courts of last resort of 18 states.

In his answer to the rule to show cause in the instant case, the trial judge stated his reasons for refusing to appoint the experts, and attached thereto all of the testimony taken at the hearing granted by him. After reading the reasons assigned by him and after considering the testimony of the witnesses called, our conclusion is that he did not abuse the "sound discretion" vested in him by law.

The judge says that, following the affirmance of the verdict and sentence in this case by the Supreme Court on July 7, 1943, and during the following month of August, he had three occasions to observe, and converse with, relator; that the last of these occasions was about one week prior to the filing of relator's application, at which time relator was taken to his library to testify as a witness in a civil proceeding involving the liability of an insurance com-

pany under a policy issued on the life of the man for whose murder the relator awaited execution; that, having learned informally that a plea of present insanity would be filed by relator and knowing that, in case such application should be filed, he would be called upon to pass on it, he took occasion to attend the taking of this testimony and to observe relator throughout the greater portion of this hearing; that relator was sworn as a witness and examined at length by the attorneys of both litigants. The judge says that during the taking of this testimony the relator "did not display any weakness of intelligence or lapse of memory". He says further: "For one of the colored race, I found him to be above the average in intelligence, power of reasoning, quickness in responding to questions with intelligent and responsive answers, and ability to recall from memory many events of a year or more past. His testimony was taken to be used in the determination of the civil liability sued on."

A few days later, counsel for relator formally applied to the court for the appointment of experts and alleged that he could prove by the sheriff, the coroner, the jailer, and one other witness that relator was insane. As we have stated, these witnesses were called and testified, and their testimony is in the record.

The sheriff testified that he had seen, and conversed with, relator at least once a week since his incarceration in the parish jail in September, 1942. He stated that once each week he went to the parish jail and not only saw, but conversed with, each and every prisoner for the purpose of learning from them how they were treated generally, whether they were supplied with sufficient food and how they liked the food, and whether they wanted anything. He said that he read the death warrant to relator and observed his reactions at that time. He said that, as far as he could see, relator's mental condition was the same the last time he saw him as it was the first time. He was finally asked what his conclusions were as to relator's mental condition. His reply was: "That man is presently sane from my observation."

The coroner testified that he had seen relator on only two occasions, once while at the jail to attend a sick prisoner and again when the death warrant was read to him by the sheriff. He said that he observed and conversed with relator on the first occasion; that relator told him at that time that he was suffering from toothache, and that relator was informed by him that he needed a dentist and not a physician. Based upon his observation of relator on these two occasions, the coroner's testimony was that in his opinion the man was sane.

The jailer testified that it was his duty to take care of the jail and the prisoners confined therein; that he had come in contact with relator daily since his incarceration. He was asked by counsel for relator: "In your observation have you found anything in his conduct to be different from the actions of a normal person?" The jailer's answer was: "No sir. He has always been the same."

One of the witnesses named by counsel for relator by whom he alleged he could

prove insanity was at one time a prisoner in the parish jail. He was released prior to the investigation and could not be found.

Counsel for relator failed to prove by the witnesses called what he thought he could prove. Each of them stated that, from his observation of, and conversations with, the prisoner, his opinion was that he was presently sane.

Clearly the judge had no reasonable ground to believe that relator was insane or mentally defective at the time the application was made. His ruling was therefore correct.

For this reason, it is ordered that the writs heretofore issued by us be, and they are now, recalled, and that the relief sought by relator be denied.