**34 So.2d 785**

**STATE v. BESSAR et al.**

**No. 38256.**

Feb. 16, 1948.

Chandler C. Luzenberg, Jr., and Bentley G. Byrnes, both of New Orleans, for defendant-appellant.

Fred S. LeBlanc, Atty. Gen., M. E. Culligan, Sr., Asst. Atty. Gen., and Herve Racivitch, Dist. Atty., and Guy Johnson, Asst. Dist. Atty., both of New Orleans, for appellee.

FOURNET, Justice.

Wilbert Powell and Joseph Bessar, Jr., having been jointly indicted and tried for the murder of Bernice Marie Roy, are appealing from their conviction and death sentence.

Powell and Bessar, who lived in the same house in the city of New Orleans but occupied different rooms, agreed after playing pool on the night of November 30, 1945, to rob someone (to "make some money" as they express it in their confessions), they being at the time armed with a gun belonging to Bessar. Leaving the poolroom they proceeded out Tulane avenue toward the lake. They walked several blocks before seeing anyone, it then being around midnight. At the corner of Derbigny and Tulane they saw a soldier, Sgt. W. F. Mears, and his companion,

Miss Bernice Marie Roy, and followed them down the street. Realizing they were being followed, Mears and Miss Roy crossed Tulane to the uptown side of the avenue, the defendants doing likewise. Continuing to follow their victims, Powell pulled the gun and ordered Mears to give them everything he had. Mears passed his wallet to Powell and he, in turn, handed it to Bessar, together with a ring he also took from Mears. Bessar then seeing the wrist watch Mears was wearing demanded it. By this time the four had reached the intersection of Tulane and Bolivar. Bessar at this point ordered the soldier and the young lady to turn and proceed up Bolivar to a parking lot in the rear of a drug store at the corner. It appears that in this parking lot Powell kept the soldier at the point of the gun with his back to the wall while Bessar, according to the testimony of Mears, attempted to rape the young lady. This is corroborated by Miss Roy's physical condition, as testified to by the coroner. Miss Roy began screaming during her scuffle with Bessar and the struggle was only interrupted by the presence of an elderly woman who passed the lot, paused, and was told to keep going but, instead, turned back, causing Powell to decide to leave and to call for Bessar to follow him. They had gone only a few steps, according to Powell's confession, when he turned and fired at Miss Roy, who had begun to scream again. The bullet struck her between the eyes. Mears ran to Tulane avenue and secured the help of some people on a passing street car. Miss Roy was carried by one of these passengers to a hospital in the immediate vicinity. She died there of the bullet wound the next day. In the meanwhile, the defendants ran away from the scene up Bolivar street, Powell emptying the gun of all of the cartridges, including the empty one, and throwing them into the street while they were still running. Arriving at their home, a few blocks up Bolivar, Bessar gave the wrist watch and ring to Powell who put them, together with the gun, in a hole in the floor near the fireplace, covering the hole with a piece of tin and a basket of coal. (According to Bessar's confession he lost the wallet.) Later in the morning and only a couple of hours after the crime, Powell was arrested and taken to the First Precinct Police Station. Bessar's arrest occurred a few minutes later and he was also taken to this station. There both of the defendants confessed. Several days later, Powell took the officers to his home and showed them where he had hidden the gun and the articles taken from the victim Mears. On December 6, 1945, Powell and Bessar were arraigned on an indictment returned the same day jointly charging them with the murder of Miss Roy and their trial was fixed for January 16 following, individual attorneys being appointed by the court to represent the two defendants.

Prior to the date of the trial counsel for the defendants obtained permission from the court to file certain preliminary plead-

ings, counsel for Powell filing a motion for the appointment of a lunacy commission and counsel for Bessar filing a motion to quash the indictment and a motion for a bill of particulars. The trial judge's action in overruling the motion for the lunacy commission, the motion to quash the indictment, and in overruling Bessar's motion for a new trial, forms the basis of the appeals taken by the defendants.

Attached to Powell's motion for the appointment. of a lunacy commission to inquire into his mental condition are five affidavits, in all of which it is stated Powell's mother and grandfather died insane and that a half-brother has, on several occasions, been confined to the state institution for the insane. In all of these is also contained the uncorroborated statement that the affiant is of the opinion Powell was then and had been for some time unable to distinguish between right and wrong.

In disposing of the bill of exceptions reserved when this motion was overruled, the trial court judge makes the following pertinent observations in his per curiam:

"The Court found nothing in the record, as made up at that time, which would afford a reasonable ground to believe that Powell was then insane. The mere fact that other members of the family of accused might have been insane, did not justify the belief that accused was then insane, nor did the uncorroborated statement of affiants afford this belief. In this connection it will be noted, that none of the affidavits made part of the record, attempt in any manner to present any facts detailing the actions of the accused, which might justify their conclusion that the accused was insane at the present time. Nor did the court have the benefit of a cross-examination of these affiants as to the basis of their conclusions as to the present sanity of the accused.

"On the other hand, Dr. C. Grenes Cole, Coroner, and an admitted expert in mental diseases, testified that he had examined the accused on the day before for an hour; that it was his opinion that Powell was sane; that he knew the difference between right and wrong and had the capacity to choose between the two; that he was sane and was able to understand the proceedings against him.

"Thereafter, on the trial of the defendant, Addie M. Kenner, George Brooks, Lula Mae Rose and Willie E. Weston were placed on the witness stand by the defense. None of these witnesses attempted to express an opinion as to the sanity of Wilbert Powell, nor did any of them testify to the slightest abnormal behavior of Powell. They contented themselves with the expression that the mother of the defendant was insane at her death.

"On behalf of the State, Dr. C. Grenes Cole and Dr. Edmund Connely, each testified in rebuttal, that Wilbert Powell was sane and responsible and fully understood the nature and quality of his acts. Dr.

Cole testified that he had examined the defendant four times, while Dr. Connely said he had examined defendant on two occasions.

"Over and beyond the testimony herein detailed, the Court had the opportunity to observe Wilbert Powell on December 6, 1945, and again on January 3rd, 11th, 17th and 18th, 1946.

"In the opinion of the court there was no reasonable ground to believe the defendant Wilbert Powell was insane or mentally defective to the extent that he was unable to understand the proceedings against him or to assist in his defense, but on the contrary, the court was of the opinion that the defendant was then sane and was sane on his trial. For these reasons, the court denied defendant's application."

In the Code of Criminal Procedure it is provided that "If before or during the trial the court has reasonable ground to believe that defendant, against whom an indictment has been found or information filed, is insane, or mentally defective, to the extent that he ·or she is unable to understand the proceedings against him or. her or to assist in his or her defense, the court shall immediately fix a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested physicians to examine the defendant with regard to his present mental condition and to testify at the hearing." Article 267, as amended by Act No. 261 of 1944. See, also, State v. Ridgway, 178

La. 606, 152 So. 306; State v. McManus, 187 La. 9, 174 So. 91; State v. Messer, 194 La. 238, 193 So. 633; State v. Allen, 204 La. 513, 15 So.2d 870; and State v. Washington, 207 La. 849, 22 So.2d 193.

In the Ridgway case the court said: *"Under the express terms of the statute, the trial judge is not required to order an inquiry into the mental condition of the defendant unless he has reasonable ground to believe that defendant is insane.* But defendant's assertion that he is insane, or even the affidavits of witnesses that they do not consider defendant is mentally sound, are not of themselves sufficient to create such belief in the mind of the trial judge. *The question is one that addresses itself to the sound discretion of the court.* Reasonable ground to believe that the defendant is insane can only arise in the mind of the trial judge when information to that effect is furnished from a trustworthy source or by credible parties, or when from the inspection or observation of the court, itself, defendant appears to be mentally unbalanced." (Italics ours.)

From the foregoing it does not appear that the trial judge abused the discretion vested in him. It is our opinion, therefore, that his ruling denying Powell's motion for the appointment of a lunacy commission was correct; it could have served no other purpose than to delay the proceedings.

For the reversal of his conviction and sentence, Bessar relies on an error alleg-

edly committed when the trial judge overruled his motion to quash the indictment after the state, in response to his motion for a bill of particulars set out "That as shown by a confession made by the Defendant, Joseph Bessar, Jr., a copy of which has been furnished and given to the Defendant through his Attorney, Bentley G. Byrnes, the said crime of Murder was committed behind the Chaille Building, between Bolivar and South Prieur Streets in the City of New Orleans, while the said Bernice Marie Roy was screaming, and while the said Defendants, Joseph Bessar, Jr., and Wilbert Powell were fleeing from the commission of the crime of Aggravated Robbery, committed upon one Sgt. William F. Mears, an escort of the deceased and while fleeing from the above scene for the commission of the crime of Attempted Aggravated Rape committed upon the person of the said deceased, Bernice Marie Roy."

It is the contention of the defendant Besser that he could not be guilty of murder since the indictment returned against him when taken together with the information furnished in the bill of particulars and the evidence introduced in support thereof fails to set out a crime within the meaning and contemplation of the crime of murder as defined in Article 30 of the Criminal Code for the reason that a killing, under this article, cannot constitute murder unless it is done while a crime is being perpetrated and at the time the kill-

ing occurred in this case, according to the bill of particulars, the crimes of attempted aggravated rape and of aggravated robbery had been completed.

The indictment returned by the jury in this case being in the short form prescribed by the Code of Criminal Procedure, the defendant was entitled to a bill of particulars setting out more specifically and in detail the offense charged, i. e., the facts upon which the prosecution is based, Article 235, as amended, and this bill, when furnished, operated to limit the scope of proof on the trial by restricting the introduction of evidence to the proof of those facts set out in the bill of particulars. 31 Corpus Juris 752, § 310, 42 C.J.S., Indictments and Informations, § 156; 27 Am.Jur. 672, Section 112. See, also, the annotations at 8 A.L.R. 550 and 10 A.L.R. 982. Consequently, the court in considering the motion to quash the indictment must construe those facts as set out in the bill of particulars to be true and determine whether or not, if proved, they constitute the crime charged.

"The weight of authority is that if a number of persons enter upon the commission of a felony, all are criminally responsible for the death of a person that ensues as a natural consequence of the common felonious purpose, although the one accused may not have done the actual killing. This rule has been deemed broad enough to include homicides committed in attempts to escape from the scene of the

crime, or 'where the killing is done immediately after the conclusion of the project, for the purpose of preventing detection.' See 13 R.C.L. p. 732. The only exception to this general rule seems to be found in People v. Marwig, 1919, 227 N.Y. 382, 125 N.E. 535, 22 A.L.R. 845, infra, and is recognized by implication in People v. Walsh, 1933, 262 N.Y. 140, 186 N.E. 422, infra, both these cases seeming to have proceeded upon the theory of technical completion of the felony, influenced in part, if not wholly, by the fact that the homicide occurred after the perpetrators had left the scene of the crime." 108 A.L.R. 847, under an annotation entitled "Homicide by companion of defendant while attempting to escape from scene of crime as murder in first degree." See, also, 26 Am.Jur. 202, Sections 64–69; 29 C.J. 1110, § 87; 40 C.J.S. Homicide, § 21.

According to the Ruling Case Law (cited. in support of the main part of the above quotation) "To bring a person within the principle under discussion, it must be made to appear that a conspiracy, combination or common design existed between him and the person who directly has taken the life of the deceased." Volume 13, Section 30 on page 729. And "Ultimately it is always a question of fact, dependent on all of the surrounding circumstances, whether the homicidal act was within the scope of the original unlawful project * * *." Section 32 on page 732.

Our law is in substantial accord with this weight of authority for under the Louisiana Criminal Code murder is defined as *"the killing of a human being,* (1) When the offender has a specific intent to kill or to inflict great bodily harm; or (2) *When the offender is engaged in the perpetration or attempted perpetration of* aggravated arson, burglary in the nighttime, burglary in the daytime, aggravated kidnapping, *aggravated rape, armed robbery,* or simple robbery, *even though he has no intent to kill"*, Article 30, and "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Article 24. (Italics ours.)

█ Clearly under the facts as set out hereinabove the deceased was killed by Powell in the furtherance of the object of the joint enterprise he and Bessar embarked upon, that is, aggravated robbery, within the meaning and contemplation of Section (2) of Article 30 of the Criminal Code. Powell himself admits in his confession that after they had robbed Mears and were interrupted in the attempted rape of the deceased by the appearance on the scene of an elderly woman, who precipitated their decision to leave, he "pulled the trigger to try and scare her (Miss Roy) and make her shut up." Obviously one of the aims of their common design or

conspiracy was to retreat safely and un-detected from the scene with the fruits of their joint enterprise. To hold as con-tended by the defendant in this case would have the effect of defeating the purpose of the statute and of destroying its efficacy. (Brackets ours.)

It is our opinion, therefore, that the trial judge properly overruled the motion to quash.

The motion for a new trial presents nothing for our consideration, being based solely on the allegation that the verdict is contrary to the law and the evidence (which proves the commission of the crime substantially as described in the bill of particulars), and the trial judge's action in overruling the motion to quash the in-dictment is, therefore, controlling.

For the reasons assigned, the conviction and sentence are affirmed.