272 So.2d 27 (1972)
Mr. Peter J. DeSALVO.
v.
Dr. Frank A. RIZZA et al.
No. 4617.
Court of Appeal of Louisiana, Fourth Circuit.
December 28, 1972.
Rehearing Denied February 6, 1973.
Writ Refused April 5, 1973.
*28 Ronald F. Fontana, New Orleans, and Leon McIntire, Westwego, for plaintiff-appellant.
H. Martin Hunley, Jr. (Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher), New Orleans, for defendants-appellees.
Before SAMUEL, REDMANN and STOULIG, JJ.
REDMANN, Judge.
Plaintiff appeals from a judgment, after an eight-day trial before jury at plaintiff's request, dismissing his damage suit alleging medical malpractice.
Plaintiff complains that the evidence does not support the jury's conclusion, that the jury was improperly constituted because of denial of challenges for cause, that some evidence was improperly excluded and other improperly admitted, and that the jury instruction was improper.
Because Louisiana courts of appeal review facts, Const, art. 7 § 29, ordinarily errors in jury selection and charge, or admission of inadmissible evidence, need not result in a remand.

Juror Challenges
Plaintiff alleges error in failing to excuse three jurors for cause. Of these, two were peremptorily challenged and therefore did not serve.
The juror who did serve after challenge for cause was the brother of a (no longer working) nurse and the nephew of the manager of a local medical clinic. However, asked whether those relationships would tend to make him sympathetic toward the doctors, that juror replied "not at all". He was "positive" he could render an impartial verdict.
Plaintiff cites the causes stated by C.C. P. art. 1765 subds. (2) and (3):
"(2) When the juror has formed an opinion in the case or is not otherwise impartial, the cause of his bias being immaterial;
"(3) When the relations whether by blood, marriage, employment, friendship, or enmity between the juror and any party or his attorney are such that it must be reasonably believed that they would influence the juror in coming to a verdict" (emphasis added).
Subd. (3) is not applicable since no relations between this juror and a party or his attorney were shown.
And, in our opinion, the juror was not shown to be not "impartial" so as to justify excuse for cause under subd. (2). See State v. Simpson, 247 La. 883, 175 So.2d *29 255 (1965). We find no abuse of the trial judge's discretion in refusing this challenge for cause.
Plaintiff complains of the refusal of challenges for cause to the two other jurors (whom he peremptorily challenged) because the refusal, when the jury was not yet obtained, deprived him of peremptory challenges he otherwise could and would have used. In criminal cases this argument has been upheld, nullifying the verdict; State v. Henry, 197 La. 999, 3 So.2d 104 (1941). We conclude that in civil cases the improper overruling of a challenge for cause, requiring a party to exhaust his peremptory challenges before jury completion, is also reviewable for purposes of determining whether the appellate court is obliged to treat the verdict with such deference as the manifest error rule affords.
Prospective juror Leo Millet, asked whether he could render a verdict against defendant doctors if proof established they were "careless in this one case," replied "I don't know". Asked by the court to explain, he said this was his first experience on a jury. Asked by counsel if he would take the evidence and apply the law given by the judge, and if he felt the doctors negligent, could he find a verdict against them, he again replied "I'm not sure." Later, he responded affirmatively to the judge's question whether it was "possible" he could return a verdict in favor of plaintiff. "Q. If the evidence and the law warranted such an award could you make one? A. I guess I could try but I have no experience in making these decisions." Finally he said he could vote for one side or the other, wasn't biased in any way, and could pay strict attention and render an impartial verdict; he knew of no reason why he could not.
Viewing Millet's responses overall, we are unable to say the trial judge erred in refusing to excuse him for cause. Millet's firm insistence he had no bias supports the conclusion that his earlier hesitancy was attributable to an incomplete understanding of his role as juror and perhaps a desire simply not to commit himself. Not having seen him and unable to know his demeanor, we are not in a position to find abuse of the trial court's necessary discretion in evaluating him as a juror. (We note that later, when jurors were asked whether anything would prevent them from sitting during a four or five day trial, Millet volunteered he had a back injury 18 months earlier, and "sitting down is one thing that bothers me quite a bit." It may well be that Millet would have preferred not to serve.)
Prospective juror Ray Martin stated that the defendant doctors had been consultants in cases involving members of his family. But he also knew plaintiff: "I'm familiar with the DeSalvo family and I know Joe DeSalvo, he's a good friend of mine and I know [plaintiff] Peter, he's an acquaintance. As a mail carrier I know these people quite well." Martin also acknowledged that Drs. Nicholson and Baehr, for whom defendant physicians acted as consultants, were his personal friends for many years. Asked by defense the extent of his acquaintance with plaintiff, Martin replied "Well, Joe, his brother, sitting out there is a personal friend of mine. I know the family quite well, by the same token I have respect for Drs. Rizza and Carter. I think it would be a problem, it would be hard for me to decide one way or the other. * * * I think if the evidence were presented and it was a clear cut matter I don't think I would hesitate to decide for or against either of them. If the evidence is there, however if it were a very touchy situation I would no doubt be very hesitant. I don't think however I could be swayed by friendship or by respect. I think my obligation, my civil obligation would cause me to say what I felt."
We cannot conclude this juror was not impartial, nor that his relations with either party were such that "it must be reasonably believed they would influence the juror" in his verdict, C.C.P. art. 1765 subd. *30 (3). His relations with both sides were about the same, and appear not to have been close with either. It was within the trial court's discretion to reject this challenge for cause also.
Thus we do not find the jury improperly constituted.

Merits
Construing the evidence most favorably to plaintiff, there is support for the conclusions first that defendant Dr. Rizza, during surgical repair of an inguinal hernia, (a) impaired the ilio-inguinal nerve by including it within a suture, (b) sutured through a small part of the spermatic cord, tying it to the public tubercle interfering with its freedom of movement, and (c) closed the external inguinal ring too tightly, impinging upon the freedom of testicular blood circulation through spermatic cord; and second that defendants Drs. Rizza and Carter did not recognize postoperatively Dr. Rizza's operative errors and promptly undertake their surgical correction. The result of the first possible negligence, during Dr. Rizza's operation, was that the second surgery had to be performed; and the result of the second possible negligence, during post-operative care, was that suffering continued too long prior to the second surgery and there is a possibility that a testicle may ultimately have to be removed.
However, by what we deem a preponderance of the evidence, one could conclude that there was no breach of the standard of care owed plaintiff by Dr. Rizza's surgery. A hydrocele operation some years earlier had left scar tissue, in which the nerve was partially bound; yet that scar tissue was properly sutured despite the risk that the nerve might be affected.[1] Similarly the fixing of cord to public tubercle could have been a normal, non-negligent though unintended result of the surgery.[2] (One expert testified that such fixing was a part of one type of hernioplasty.) And the encroachment of external ring upon cord, according to some experts (contradicted by others), might occur through scar-development; and there is also evidence from other experts that the ring (externally palpable through the scrotum) was not too tight.
Furthermore, as to the postoperative care, by the unanimous testimony of all experts, if defendant doctors' records are accurate in showing no unusual symptom or complaint by plaintiff, their care was reasonable and proper. Only one expert for plaintiff testified that (while he agreed defendants' records showed no reason for prompt resurgery) the frequency of plaintiff's postoperative visits would have caused him to do a more comprehensive work-up; that expert felt strongly that he personally would have decided to reoperate six to eight weeks after the first hernia operation.
There was, in respect to plaintiff's postoperative symptoms, an issue of fact raised by plaintiff's testimony his testicle constantly hurt and swelled, and this condition was aggravated by standing or working. Defendant doctors' records showed no such complaint until about 14 weeks after the *31 operation. Earlier records showed him "asymptomatic" at five weeks (said to mean patient reported no symptoms). And although at six weeks the patient "has some tenderness along incision", at eight weeks "would looks good; no significant tenderness; testis is not tender." (Defendant doctors did not see plaintiff between the eighth and fourteenth weeks because he had a back injury for which he was hospitalized by another doctor.)
Although we lean towards agreement with plaintiff's expert that the frequency of visits might suggest some problem beyond the normal ones defendants' records indicate, defendants point out that plaintiff was also unusually frequent in his preoperation visits. And, we repeat, unless the postoperative visits revealed symptoms other than those noted in defendants' records, the experts agree that resurgery was not indicated until 14 weeks or more after the hernia operation.
At that time defendants diagnosed possible orchitis or epididymitis and after one week referred plaintiff to a urologist who promptly hospitalized him for tests. Some two weeks later resurgery was done which did not completely eliminate plaintiff's complaints. (Another urologist was later unable to completely eliminate pain by xylocaine injection, and opined that removal of the testicle would be similarly ineffective.)
Accordingly we would affirm the judgment on the jury's verdict as amply supported by the evidence.

Evidentiary Rulings
Plaintiff complains of the exclusion of letters from defense counsel either directly to an expert, or to his client with carbon copy to the expert. Not privileged as attorney-client communications, the letters were properly ruled immaterial by the trial judge. One of the letters contained an explanation of "Our defense in this case, which I am advised by [another defense expert] is a proper one, * *." Plaintiff claims this means the expert "suggested a possible defense." Without agreeing with that interpretation, we reject the implication that a lawyer may not use as an expert witness one whose assistance he has sought and obtained in preparing his defense.
Plaintiff also complains of the testimony by a pathologist relative to the second evaluation of the suture-bound tissue thought to contain a segment of the ilio-inguinal nerve. Because an associated pathologist made the report, plaintiff objected after the testimony, "all this testimony has been hearsay". The testifying pathologist spoke of his own observation of the slides prepared from the paraffin-preserved tissue. The hearsay objection did not come at the outset of the testimony, and therefore does not raise the question whether testimony such as that the tissue was that taken from plaintiff is excludible as hearsay. Nor was the objection (or motion to instruct the jury to disregard) made with reference to the pathologist's statement that two other pathologists agreed with his second evaluation. We find no merit to the general objection to the pathologist's testimony.

Jury Charge
Plaintiff's objections to the jury charge were not presented to the trial judge, according to the record, despite the trial judge's able analysis for counsel of the logical necessity of C.C.P. art. 1793's requirement that objections be made prior to the jury's retiring to deliberate. Plaintiff presented 49 "Supplemental Plaintiff's Requested Jury Charges". However, the record reflects no objection to their non-inclusion, to whatever extent, in the judge's charge. Nor was there any objection to the judge's charge (proposed to counsel at the end of presentation of evidence the previous day) as otherwise incorrect.
*32 We have reviewed the charge given and conclude that it represents a reasonably adequate instruction on the law applicable to the evidence presented.

Decree
The judgment is affirmed.
NOTES
[1] One could conclude that the nerve was not caught by the suture. The only pathologist to testify stated that later, speccially-stained slides (made at defense counsel's request) showed that the suture-bound tissue excised at the corrective surgery was scar and not nerve. He explained that the two tissues are difficult to differentiate in normal examination, and that the earlier pathological report simply accepted the surgeon's submission of "nerve" as such.

However, the testimony of the three surgeons who participated in the corrective surgery could be accepted as establishing that the nerve was suture-bound. Nevertheless the fact that scar tissue increases the risk of untoward occurrences is shown by testimony of one of these surgeons that during the corrective surgery he actually severed the nerve inadvertently due to its envelopment in scar tissue.
[2] A lipoma of the cord was also excised by Dr. Rizza.