3 So.2d 104

**STATE v. HENRY.**

No. 36165.

May 26, 1941.

Eugene Stanley, Atty. Gen., Niels F. Hertz, Sp. Asst. Atty. Gen., and C. V. Pattison, Dist. Atty., and Coleman D. Reed and John H. Martin, Asst. Dist. Attys., all of Lake Charles, for the State, plaintiff and appellee.

Clement M. Moss and Norman F. Anderson, both of Lake Charles, for defendant, appellant.

ODOM, Justice.

The defendant has twice been convicted of murder and twice had a death sentence imposed upon her. We set the first conviction and sentence aside and remanded the case for retrial. State v. Henry, 196 La. 217, 198 So. 910.

She has appealed from the second conviction and sentence. Her plea for reversal of the conviction and sentence is grounded upon numerous alleged erroneous rulings of the trial court during the progress of the trial, which alleged errors are set out in 20 or more bills of exception. Some of the bills have no merit. Others disclose fatal errors, and we find it necessary to set the verdict and sentence aside and again remand the case for retrial.

Some of the bills relate to alleged erroneous rulings which are not likely to be made at a subsequent trial. These we shall not discuss. Other bills relate to issues which are likely to arise at a subsequent trial, and for that reason we shall dispose of them although they have no merit.

The bills which have merit are numbered 7, 8, 9, 11, 13, and 14. Bills 7, 8, 9, 11, and 14 may be grouped and considered together because each relates to the same complaint urged by counsel for defendant, which is that the court permitted the district attorney to go beyond the limits allowed by law in his questioning of the veniremen on their voir dire as to their feelings and scruples relating to the infliction of the death penalty in capital cases. Specifically, the complaint urged by counsel for defendant is that the district attorney was permitted to propound certain questions to the prospective jurors while they were being examined on their voir dire with the purpose and intent of having them commit themselves in advance to the rendition of a cer-

tain verdict if the testimony convinced them that the accused was guilty of the crime of murder; that the court, over their objection, permitted such examination and allowed the jurors to answer the questions objected to, and that the answers made by the jurors did in fact show that they favored the rendition of a certain verdict. Therefore, counsel argue, these jurors were incompetent, and the court erred in refusing to sustain their challenge of them for cause.

Whether the district attorney intended that his examination of the jurors on their voir dire should have the effect of inducing them to commit themselves in advance to the rendition of a certain verdict is not the question. The question is whether as a result of his examination the jurors did in fact so commit themselves. We think such was the result.

There is merit in counsel's complaint. Kenneth Vincent, a venireman, while being questioned by the district attorney on his voir dire, was asked whether he had any conscientious scruples against the infliction of capital punishment, and said, "No, not in a just case." The district attorney propounded to him the following question:

"In a case where the penalty may be death, where you are satisfied beyond any reasonable doubt that the defendant is guilty, could you vote for the death verdict without hurting your conscience?"

The juryman's answer was "Yes".

Counsel for defendant urged no objection to the last above question and answer, the reason being, of course, that the question was but an amplification of the routine question relating to the juror's scruples as to the infliction of the death penalty.

The district attorney then asked the venireman the following question:

"In the same case if you were satisfied beyond any reasonable doubt that the defendant was guilty, you were convinced by all the facts and circumstances that the defendant were not entitled to a qualified verdict or mercy, would you vote for the death penalty?"

To this question counsel for defendant made the following objection:

"We object to the question for the reason that it is an attempt to commit the juryman in advance to some certain verdict, and that the rendition of a qualified or unqualified verdict is a matter solely under the discretion of the juror, to be exercised as they desire."

The court overruled the objection and permitted the juror to answer it, his answer being "Yes".

The district attorney asked the venireman Lee Koone the following question:

"In a case where the law provides you may bring in such a verdict [meaning a verdict carrying with it capital punishment] and where you were satisfied beyond any doubt that defendant was guilty could you vote for the death penalty without hurting your conscience?"

His answer was "Yes". The district attorney then asked him:

"In the same case where you were satisfied that defendant was guilty beyond any

reasonable doubt and were convinced considering all the facts and circumstances that the defendant was not entitled to a qualified verdict, or mercy, would you vote for such a verdict?"

Counsel for defendant objected to the question for the same reasons they urged to the same question propounded to the venireman Vincent. The court overruled the objection and permitted the juryman to answer the question, his answer being "Yes".

The identical questions propounded to the veniremen Vincent and Koone were propounded to each of the jurors who served, and in each case the same objections were made by counsel for defendant and overruled by the court, and the answers were the same. The court explained to counsel for defendant that they need not reserve a bill in each case, for the reason that his ruling would be the same and that counsel's objection would serve the purpose of a bill.

Because defendant's peremptory challenges were exhausted before the jury was completed, she was compelled to accept jurors who, like Vincent and Koone, stated that, if they were convinced from the evidence that the accused was guilty and if in their opinion there were no mitigating circumstances, they would render a verdict carrying with it the death penalty.

If the district attorney had gone no further than to ask the veniremen whether, in case they were convinced from the evidence that the accused was guilty of the charge brought against her, they *could* render a verdict which would carry with it the death penalty without offending their conscience, defendant's complaint would have no merit. But it was highly improper for him to go further and ask them whether under like circumstances they *would* render such a verdict. By answering that question in the affirmative, as each of the jurors did, according to the record, the jurors, in effect, committed themselves in advance to the proposition that, if after hearing the evidence they were convinced that the defendant was guilty of the crime of murder and if in their opinion there were no mitigating circumstances entitling her to a qualified verdict, "or mercy", they would render a verdict carrying with it capital punishment.

The effect of the line of questioning which the district attorney was permitted to pursue, and which elicited from the jurors the answers which they gave, was to put them definitely on record as favoring death rather than life imprisonment as punishment for murder where there were no mitigating circumstances.

Article 409 of the Code of Criminal Procedure reads as follows:

"In all capital cases the jury may qualify its verdict of guilty with the addition of 'without capital punishment,' in which case the punishment shall be imprisonment at hard labor for life."

The language of this article of the Code is plain. In "all capital cases", or cases involving a crime for which the punishment may under the law be death, the jury is given the absolute, unconditional right and power so to qualify its verdict of guilty as to relieve the defendant of the

payment of the extreme penalty for the commission of the crime. The jury may accomplish such purpose by rendering a verdict of guilty followed by the words "without capital punishment", the effect of which is to fix the punishment at hard labor for life. This power is analagous to the commuting power of the governor. This power may be exercised by the jury without regard to the circumstances under which the crime was committed. Even though a jury may be convinced after hearing the evidence that the crime was an atrocious, revolting one, it still has the power to remit the extreme penalty.

Instead of adopting Article 409 of the Code to read as it does, the Legislature could have worded it so as to provide that the jury, after finding an accused guilty as charged, might so qualify its verdict as to remit the extreme penalty "if the circumstances of the case in the opinion of the jurors justify it". But it did nothing of the kind. Its intent and purpose evidently was to vest the jury with authority to mitigate the punishment within the limits specified, the authority to be exercised at the discretion of the jury. The jurors are not required to find or have any special reason for their conclusion to render a qualified verdict, but under the statute as written there is extended to them the privilege and the power of rendering either a qualified or an unqualified verdict. They should be left entirely free to consider that question after they have agreed upon a verdict of guilty.

The law does not contemplate that counsel on either side should question prospective jurors in capital cases as to the kind of verdict they would favor under any given state of facts or circumstances, and the court should not permit such questioning. To permit such questioning would open wide the door to an interminable line of questions as to what would in the jurors' opinion constitute a case in which a qualified verdict should be rendered. The jurors themselves might differ as to the kind or character of circumstances which would "entitle" a defendant to a qualified verdict. We use the word "entitle" because that is the word used by the district attorney in questioning the jurors as to the kind of verdict they would render in case they were convinced by the testimony that the defendant was guilty of murder. If it were proper to question a prospective juror as to what his verdict would be under certain given circumstances, it would be proper also to question him as to the nature and character of circumstances which would influence him one way or the other.

"While the extent to which counsel in examining jurors on their voir dire may go in asking hypothetical questions lies generally in the discretion of the court, it is a rule that hypothetical questions are not competent when their evident purpose is to have the jurors indicate in advance what their decision will be under a certain state of the evidence, or upon a certain state of facts, and thus possibly commit them to certain ideas or views when the case shall be finally submitted to them for their decision." 31 Am.Jur., Sec. 154, p. 670. See to the same effect 16 R.C.L., Sec. 97, p. 281.

■ We quote the following extract from 35 C.J., p. 391, found under the general heading "Juries":

"Thus it is not competent to examine jurors as to how they would act or decide in certain contingencies, or in case the court should give certain instructions, or in case certain evidence or a certain state of evidence should be developed on the trial, or as to his attitude toward a particular witness who is expected to testify in the case."

Numerous cases are cited in support of the text, among them being State **v.** Plummer, 153 La. 730, 96 So. 548.

In the Plummer case, decided by this court, the jurors were asked on their voir dire whether, "if the evidence showed that the accused had never been previously convicted of any felony or misdemeanor and was of good character, they would recommend suspension of sentence, if the accused were found guilty". The trial judge refused to allow the question in the form in which counsel put it, but did permit counsel to ask the question only in such form as to inquire "whether the juror would be willing to recommend suspension under the circumstances". We said:

"The trial judge ruled correctly. The manifest purpose of the question, as first put, was to commit the juror absolutely to a recommendation for a suspended sentence, whereas Act 74 of 1914 leaves it optional with the jury to recommend the suspension of the sentence."

■ Under our law, it is optional with the jurors to qualify their verdict, and

counsel for the State has no right to question them as to the character of verdict they would favor under a given state of facts. In the case at bar, the questions asked and the answers made disclosed very clearly, we think, the character of verdict the jurors would render if convinced beyond reasonable doubt that the accused was guilty of the crime of murder as charged. Their answers disclosed the views which they held as to the kind of punishment which should be inflicted for the crime of murder in cases where there were no extenuating circumstances. Their answers showed that they would not vote for a qualified verdict in such cases. Thus, each of the jurors indicated in advance what his verdict would be under a certain state of facts or under a certain state of evidence.

The effect of the court's ruling was to compel defendant to accept jurors who admittedly favored the rendition of an unqualified verdict, and therefore the death penalty, as punishment for the crime of murder where there were no mitigating circumstances.

We, in effect at least, laid down the rule applicable to this point in our previous opinion. State v. Henry, supra. Counsel for the State say in their brief that by our ruling in that case we "permitted more latitude in the examination of prospective jurors than was heretofore permitted", and they argue that the examination of the jurors at the second trial was in strict accordance with our previous ruling in the same case.

Counsel for the State are mistaken. At the previous trial, counsel for defendant, in order to ascertain whether certain of the prospective jurors would return a capital verdict only, propounded the following question to the juror Quirk [196 La. 217, 198 So. 914]:

"When you retire to the jury room if you feel that under all the circumstances of the case that guilty without capital punishment is a fair thing you won't hesitate to bring such a verdict will you?"
and to another juror:

"I want to ask you if she is proven guilty if you could also vote for a verdict of guilty without capital punishment, but (or) imprisonment for life?"

Counsel for the State objected to both these questions, and the objections were sustained in each instance. We held that the ruling was improper for the reason that the purpose of the questions as framed was to ascertain whether the jurors " * * * had any prejudice against rendering a qualified verdict in a murder case, or if they only favored the death penalty in such a case. To be impartial jurors in this case they should have been free of any scruples or personal opinions which would have prevented them from imposing either the death penalty or life imprisonment. If they had conscientious scruples against the infliction of capital punishment they were subject to challenge for cause by the state. Article 352, Code of Criminal Procedure. If they would impose only the death penalty in a murder case they were likewise subject to challenge for cause by the defendant. This was not an effort to show that they were personally biased or prejudiced against the defendant nor was it an attempt to commit them in advance to a qualified verdict, but counsel, through their examination, were endeavoring to ascertain whether or not the penalty of death was the only punishment these prospective jurors considered proper and adequate in murder cases."

We held, and properly, that the defendant was entitled to information as to whether the prospective juror would favor only the death penalty in case of conviction for murder as charged—in other words, whether he was opposed to life imprisonment as punishment in such cases. Certainly, if the State is entitled to information as to whether a prospective juror has conscientious scruples against the infliction of capital punishment or is opposed to such punishment on principle, the defendant is entitled to information as to whether a juror is opposed to life imprisonment as a punishment. As we said, it was perfectly clear that the purpose of the examination in that case was not to commit the jurors in advance to the rendition of a certain verdict, but to find out whether they were opposed to life imprisonment as punishment for murder.

Bill of Exception No. 13 is based upon the refusal of the trial judge to sustain defendant's challenge of a certain prospective juror for cause. The venireman, when questioned on his voir dire, was asked whether he had any personal knowledge of the facts connected with the case, and stated in reply, "No more than what I have read." He said he had heard the

case discussed and that he had discussed it with his friends. He was asked whether he had expressed an opinion as to defendant's guilt or innocence, and said that he had. He was asked whether he then had an opinion as to her guilt or innocence, and he said, "Yes I have an opinion." He was asked whether he could disregard that opinion and render a verdict solely on the evidence. His answer was, "Yes I think I could."

The court then asked the venireman whether he could set aside the opinion he had and render a verdict solely on the evidence that was adduced at the trial, and he replied, "I think I can." He was then asked by the court whether, if he were sworn as a juror, he would be able to try the case as though he had never heard or read of it before. He replied, "I think I am."

The court then said to him, "You are the only man that can answer the question, if you can say so, if you can't say so." The juror said, "Well I believe I can do it, I don't know until after I hear the—" In answer to further questions propounded to him by the court, the juror stated that he would render a verdict based solely on the evidence adduced at the trial and would not try the case on what he had read in the newspapers or had heard on the street. The judge then stated that he thought the juror was qualified.

But counsel for defendant interrogated the juror further and elicited from him the following answers:

"Q. Mr. Todd you think that your opinion would have any influence on the

conclusion you would reach if you were accepted as a juror? A. I don't know.

"Q. You think it might have some effect on it? A. I don't know."

The questions propounded to this juror and his answers show conclusively that he then entertained an opinion as to the guilt or innocence of the accused and that he had expressed that opinion, and, while he stated in answer to questions propounded to him by the trial judge that he would render a verdict based solely on the evidence, yet in answer to other questions propounded to him he made it clear that he was not certain that he could disregard the opinion which he had formed. In answer to one question he stated that he thought he could lay aside the opinion which he had already formed, and in answer to another that he believed he could but indicated that he would not know until after he heard the evidence, and finally stated that he did not know whether he could lay aside his opinion or not. He did not say, even to the judge, that the opinion which he had formed and expressed would readily yield to the evidence—which is the true test.

Clearly he was not qualified to sit on the jury. In State v. Guillory, 146 La. 434, 83 So. 754, it was held that: "No man who has formed an opinion of the guilt or innocence of the accused should be allowed to serve as a juror unless he swears on his voir dire that he can and will put aside his opinion and, presuming the accused to be innocent, try the case only upon the law and evidence." (Para-

graph 4, Syllabus.) See State v. McCoy, 109 La. 682, 33 So. 730, 731.

▮ The fact that a man has formed an opinion as to the guilt or innocence of an accused does not necessarily disqualify him from serving as a juror. If he states on his voir dire examination that his opinion would readily yield to the testimony adduced, that he could and would lay aside that opinion, he is competent. But where, as in the instant case, the juror makes it plain that he has an opinion and that he is not sure that he can lay it aside, he is not competent.

▮ After the court overruled defendant's challenge for cause, the juror was then challenged peremptorily, and the record shows that defendant had not then exhausted her peremptory challenges. But the record shows affirmatively that she did exhaust her peremptory challenges before the jury was completed, and that she was compelled to accept objectionable jurors after her peremptory challenges were exhausted.

The established rule is that: "Where, in a criminal prosecution, a challenge for cause is improperly overruled, and the defendant's peremptory challenges are exhausted before the jury is obtained, the accused is prejudiced, and the verdict will be set aside." Syllabus, Paragraph 6, State v. McCoy, supra. See State v. Guillory, supra, Syllabus, Paragraph 5.

We think the rulings complained of, as set forth in Bills No. 7, 8, 9, 11, 13, and 14, were erroneous and highly prejudicial, and constitute reversible error.

Bills No. 1, 2, and 3 were reserved to the overruling of defendant's motion to quash the indictment. There is no merit in any of these bills. The motions to quash were based on the grounds (1) that a stranger participated in the deliberations of the grand jury which returned the indictment, and (2) that the indictment was vitiated and annulled by prejudicial foreign matter written on its face.

As relates to the first point, the facts are that, after the grand jury was empanelled, a criminal charge was filed against one of its members, whereupon the judge discharged the indicted juror and had the vacancy caused by his discharge supplied in accordance with the rules prescribed by law. Counsel for defendant attempted to show that the juror who was discharged was not guilty of the charge brought against him and that therefore he was illegally discharged, and for that reason the juror who was empanelled and sworn to take his place was a "stranger" on the grand jury and his presence vitiated all subsequent proceedings of that grand jury. The indictment was brought in by the grand jury after the substitution was made.

▮ Under Article 172 of the Code of Criminal Procedure, a juror is not competent if he stands "charged with any offense". At the time the grand juror was discharged, there was a criminal charge pending against him, of which the judge took judicial cognizance because the charge was filed and was then pending in his court. Article 422, Code of Criminal Procedure. The juror being incompetent, it

was necessary that he be discharged and that another be called to fill the vacancy. We find no merit in this bill.

■ As to the ground for the other motion to quash, the facts are that the defendant and a man named Finnon Burks were jointly charged in one indictment. The defendant Burks was separately tried and found guilty as charged. The petit jury which tried Burks took the indictment into their room, and the foreman wrote on the face of the indictment "We the Jury find the defendant Guilty as charged", and signed his name as foreman.

The contention is that this writing vitiated the indictment. We do not think so. The writing did not and could not form any part of the indictment. The writing's appearing where it did had no more effect upon the validity of the indictment than if the same writing had appeared elsewhere thereon.

In this connection, we dispose of the objection raised by Bill No. 16, which was based on the ground that the foreign matter written on the indictment resulted in prejudice to the accused on the trial of this case because the indictment, together with the "foreign writing", was exposed to the jury.

■ There is no merit in this bill. Counsel for defendant do not contend that the jurors read the alleged foreign inscription on the face of the indictment. They merely contend that the jurors could have read it because the indictment was exposed within three feet of them. The judge's per curiam to this bill shows that

as a matter of fact the jurors did not read it and had no knowledge as to what had been written on the indictment.

Counsel for defendant filed a written motion to recuse the Honorable Mark C. Pickrel, trial judge, on the ground that the judge was interested in the cause. The judge refused to recuse himself and, refused also to call in another judge to try the motion to recuse. Bill of Exception No. 4 was reserved to the ruling of the judge.

Article 303 of the Code of Criminal Procedure prescribes the causes for which a judge may be recused, one of which is "His being interested in the cause".

Counsel for defendant neither alleged nor showed that Judge Pickrel had such an interest in the case as would warrant his recusation. The facts necessary to be stated in connection with this motion to recuse are that the defendant and Finnon Burks were jointly charged with the murder of a man named Calloway. The defendant Burks was separately tried, convicted, and sentenced to be hanged. The lieutenant governor, during the absence of the governor from the state, issued a warrant fixing the date on which Burks should be hanged. Counsel for defendant alleged, and Judge Pickrel admits, that he made a trip to Baton Rouge to see the governor in connection with the execution of Burks. According to press reports, the acting governor made the following statement:

"It would be manifestly unfair to execute one of those accused of the killing

while the fate of the other is still pending, because under the law both parties are held equally responsible."

According to newspaper accounts, the above statement was made by the lieutenant governor after he conferred with Judge Pickrel. The fact that Judge Pickrel may have consulted the lieutenant governor with reference to the execution of Burks does not necessarily indicate that the judge had any interest in the result or outcome of the trial of Mrs. Henry. The judge states in his per curiam that he did not attend the trial of Burks, knew nothing of the facts connected with the homicide except what he had learned from press reports and hearsay. There is nothing whatever to show that Judge Pickrel at any time formed or expressed an opinion as to the guilt or innocence of the defendant Mrs. Henry, and no showing whatever that he had ever manifested any interest in her case. The trip to Baton Rouge was to consult the lieutenant governor with reference to the execution of Burks. Counsel's allegation that the judge was interested in Mrs. Henry's case is based purely upon their own suppositions and conclusions, and is not supported by the facts.

■ In State v. Phillips, 159 La. 903, 106 So. 375, 376, this court, through its organ, Justice Overton, said:

"For a judge to have an interest in a case within the meaning of the law, relative to the recusation of judges (Act No. 40 of 1880 and Act No. 203 of 1918), some fact must exist that leads to the conclusion that it is to the judge's personal advantage,

whether he would be influenced by such advantage or not, to decide the case or to seek to bring about a decision therein, for or against one of the parties to it, without reference to the law and the evidence."

See also State v. Davis, 154 La. 928, 98 So. 422; 14 Am.Jur., p. 850, Sec. 121.

■ Under the allegations and showing made by counsel for defendant, the judge correctly refused to entertain the motion to recuse.

Bills No. 5, 6, 10, and 15 relate to the manner in which the State was permitted to exercise its peremptory challenges. The method of selecting the jurors was in accord with the provisions of Article 358 of the Code of Criminal Procedure. That article of the Code provides that the jurors shall be first tendered to the prosecution for examination and, if accepted, then tendered to the defense. The Code further provides that, after a juror has been accepted by both sides, neither side has a right to challenge him peremptorily "but it shall be within the discretion of the court, and not subject to review to allow either side to peremptorily challenge jurors up to the time that the jury is impaneled".

■ The jurors were first examined by the district attorney and after his examination were tendered to counsel for the defense for examination. The district attorney did not formally accept the jurors after examining them and before tendering them for examination to counsel for defendant. Counsel for defendant argue that the district attorney should have been required to accept the jurors formally be-

fore they were tendered for examination to defendant. In State v. Wells, 171 La. 795, 132 So. 349, it was held that the tendering of the jurors by the State after examination was a tentative acceptance of them, and that the State was not required to announce its acceptance of them formally. The ruling in that case disposes of defendant's main objection to the selection of the jurors.

After the jurors were examined by counsel for defendant, they were tendered back to the district attorney, who was then permitted to challenge seven of them peremptorily. Under repeated rulings of this court, this was permissible. The district attorney did not attempt to withdraw his acceptance of the jurors, but challenged them peremptorily. The Code specifically provides that the court within its discretion may permit either side to challenge a juror peremptorily up to the time the jury is empanelled. State v. Ussery, 178 La. 593, 152 So. 302; State v. Ezell, 189 La. 151, 179 So. 64; State v. Thornhill, 188 La. 762, 178 So. 343; State v. Boone, 194 La. 977, 195 So. 511.

There is no merit in Bill of Exception No. 17, which was reserved to the ruling of the court permitting the State, over defendant's objection, to introduce in evidence photographs of the body of the deceased where it lay on the ground by a haystack in a pasture, where the homicide

took place. The judge in his per curiam states that he permitted the introduction of the photographs in evidence to show the position of the body, the scene of the crime, and the place of penetration of the bullet. The photographs were admissible for those purposes. State v. Messer, 194 La. 238, 193 So. 633.

We find no merit in Bill of Exception No. 19, which was reserved to the ruling of the court permitting Finnon Burks, who had already been convicted and sentenced for the crime of murder, to testify as a witness for the State. Defendant objected to his testimony on the ground that he was not a competent witness.

Article 461 of the Code of Criminal Procedure says that a competent witness in any criminal proceeding "shall be a person of proper understanding".

In State v. Robertson, 196 La. 982, 200 So. 320, 321, decided January 6, 1941, it was held that:

"Convicted and sentenced felons are competent witnesses under statute defining a 'competent witness' in any criminal proceeding to be a person of proper understanding." (Paragraph 3, Syllabus.)

For the reasons assigned in connection with Bills No. 7, 8, 9, 11, 13, and 14, the conviction and sentence are set aside, and the case is remanded for retrial.