STATE OF NORTH CAROLINA v. ERNEST JOHN VINSON

No. 48

(Filed 6 June 1975)

1. **Constitutional Law § 29; Criminal Law § 135; Jury § 7— exclusion of juror opposed to capital punishment**

   The trial court in a rape case did not err in excusing for cause a juror who stated on her *voir dire* examination that under no circumstances and regardless of the evidence would she return a verdict of guilty if it meant imposition of the death penalty.

2. **Jury § 5— prospective jurors — names drawn by deputy sheriff — jury selection begun anew**

   Although there is no requirement for the clerk of court personally, or through an assistant or deputy clerk, to make the random drawing of the names of those on the jury panel for interrogation concerning their fitness to serve as jurors so as to render illegal such drawing by someone else, when it was brought to the attention of the trial court that some of the names had been drawn by a deputy sheriff, the court did not err in nullifying the proceedings and starting anew by returning to the hat or box from which drawn the names of the nine jurors already accepted by both sides, discarding the names of all jurors already challenged successfully by either party, and giving defendant fourteen and the State nine peremptory challenges, the maximum allowed by G.S. 9-21(a) and (b), without regard to any peremptory challenges either the State or defendant may have exercised theretofore.

3. **Jury § 7— challenges**

   Challenges for cause are without limit if cause is shown, while peremptory challenges may be exercised within the limits allowed by law.

4. **Jury § 6— examination of jurors**

   While a wide latitude is allowed counsel in examining jurors on *voir dire,* the form of the questions is within the sound discretion of the court.

5. **Jury § 6— examination of prospective jurors — hypothetical questions**

   On the *voir dire* examination of prospective jurors, hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed.

State v. Vinson

**6. Jury § 6— examination of prospective jurors — verdict under certain facts**

The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts.

**7. Jury § 6— examination of prospective jurors — unsupported assumption — subquestions**

The trial court in a rape case did not err in excluding a question to prospective jurors which was based on the unsupported assumption that "everyone on the jury is in favor of capital punishment and is in favor of that punishment for this offense" and which contained two subquestions dealing with different points of inquiry.

**8. Jury § 6— examination of prospective jurors — facts mitigating death penalty**

The trial court properly disallowed a question seeking to elicit information concerning "any" circumstances or set of facts which would mitigate a juror's views on the death penalty in a rape case.

**9. Jury § 6— examination of prospective jurors — insanity — unconsciousness**

The trial court properly disallowed questions to prospective jurors relating to hypothetical circumstances in which defendant "couldn't control his actions," "was not conscious of his act" or "did not intentionally or wilfully commit the act" since the questions were manifestly confusing and contained inadequate statements of the law.

**10. Jury § 6— examination of prospective jurors — repetitious questions**

The trial court properly limited further repetitious questions to a prospective juror concerning the hypothetical defense of insanity where the juror indicated he "didn't know how to answer that question."

**11. Criminal Law §§ 71, 89— statements to detective — corroboration — use of word "rape"**

A detective's testimony concerning what a rape victim told him during his investigation of the incident was competent to corroborate the previous testimony of the victim; furthermore, the victim's use of the word "rape" during that investigation did not constitute an opinion on a question of law.

**12. Criminal Law § 66— photographic identification — failure to hold voir dire**

The trial court in a rape case did not err in admitting without a *voir dire* examination the testimony of a detective concerning the victim's identification of a photograph of defendant prior to trial where the victim on direct examination had already made an in-court identification of defendant and on cross-examination gave explicit testimony of the pretrial identification, all without objection or request for a *voir dire* examination, and there is nothing in the record suggesting the pretrial procedure was impermissibly suggestive.

State v. Vinson

13. **Criminal Law § 77— self-serving declaration**

In this rape prosecution, the trial court did not err in the exclusion of testimony by a psychiatrist that defendant professed no knowledge of any crime of rape since the testimony constituted hearsay and was inadmissible as a self-serving declaration.

14. **Criminal Law § 53— medical expert — drug use by defendant — exclusion of opinion**

The trial court's exclusion of a psychiatrist's opinion on direct examination as to the extent of drug use by defendant, if erroneous, was not prejudicial since substantially the same testimony was given on redirect.

15. **Criminal Law §§ 53, 88— cross-examination — treatment of defendant**

Answers of a psychiatrist on cross-examination to questions concerning the course of treatment of defendant were pertinent to matters covered on direct examination and were admissible.

16. **Rape § 5— sufficiency of evidence**

The State's evidence was sufficient for the jury in a rape prosecution where testimony of the prosecutrix tends to show that defendant had intercourse with her by force and against her will.

17. **Rape § 6— failure to define "sexual intercourse"**

The trial court in a rape prosecution did not err in failing to define "sexual intercourse" and to charge that rape requires penetration by the male organ where all the State's evidence clearly points to two completed acts of penetration, there was no evidence to the contrary and the defense was not grounded on lack of penetration since, under these circumstances, the term "sexual intercourse" conveyed the idea of completed intercourse, including actual penetration.

18. **Criminal Law § 112— reasonable doubt — lack of evidence**

The trial court in a rape case did not err in failing to instruct the jury to consider the "lack of evidence" as well as the evidence in the case where the evidence was not circumstantial but was direct and amply sufficient to support the verdict.

19. **Criminal Law § 5— failure to charge on insanity**

The trial court in a rape case did not err in failing to charge on insanity or lack of mental capacity where defendant did not make a formal plea of insanity or request such instructions and there was no evidence in the record tending to show that he was insane or lacked requisite mental capacity to commit the crime, evidence of low mentality in itself not being sufficient to raise a defense to a criminal charge.

20. **Constitutional Law § 36; Criminal Law § 135— death penalty for rape**

Imposition of the death penalty for rape did not constitute cruel and unusual punishment.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to death sentence.

State v. Vinson

DEFENDANT appeals from judgment of *Rouse, J.*, 18 March 1974 Criminal Session, WILSON Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging him with the rape of Norma Coleen Ferguson on 5 December 1973 in Wilson County.

The State's evidence tends to show that on 5 December 1973 Norma Coleen Ferguson was employed at Fiberglass and Sports, 450 Black Creek Road in Wilson. At 12:45 p.m., defendant entered and said he wanted to look at life preservers. He picked out three and followed Mrs. Ferguson around to the cash register where she prepared a sales slip. When she looked up and told him the price, defendant was pointing a gun at her head and said, "You scream, I'll kill you." Mrs. Ferguson backed away from the cash register and said, "Take the money." Defendant replied, "Get in the back room." He placed the pistol at her head and backed her into the back room which was used for an office. Then he said, "Get naked." She pleaded with him to no avail and he cocked the pistol saying, "Get naked or I'll kill you." She removed the bottom part of her pantsuit and defendant raped her twice, first bent across the desk and thereafter on the floor. Between the two acts he held the cocked pistol to her head and forced her to perform an unnatural sex act upon him.

Defendant told Mrs. Ferguson he was going to kill her "at least ten or fifteen times." He prowled around the office opening drawers. He opened the cash register and removed approximately $40.00 from it. He went through her purse, removed a bottle of diet pills and forced her to swallow a handful of them, threatening to kill her because she was swallowing them too slowly. Finally, defendant removed her car keys from her purse, went outside, and drove away in her car.

Police officers were summoned and Mrs. Ferguson told them what had occurred. She was taken to the Wilson Clinic and examined by Dr. Kirkland. This examination showed evidence of recent intercourse and the presence of active sperm in the vagina. Dr. Kirkland stated that Mrs. Ferguson was quite upset, very nervous and distraught, and told him that a black man entered the place where she worked, forced her at gunpoint to perform an unnatural sex act, and raped her; that he forced her to take ten or eleven tablets he found in her pocketbook and thereafter left in her car.

Thomas Edwards, a driver for Roadway Express, arrived at the Fiberglass and Sports place of business on Old Black Creek Road about 1 p.m. on 5 December 1973 to make a delivery. No one was in the sales room but he heard a lady's voice in the office say, "Oh my God, why?" Hearing nothing more, he assumed she had received bad news over the telephone and decided to leave her alone. As he left he heard her say, "I only got a dollar in my pocketbook, all the money is in the cash register." He drove about one-half mile to a telephone and told his supervisor to call "that lady up there at that office" because she either got bad news or was in terrible trouble. The supervisor called, and when Mrs. Ferguson answered the phone she sounded all right. When Mr. Edwards returned to make the delivery, a dark black man stuck his head out and, ascertaining that Mr. Edwards had a piece of freight to deliver, said, "Well, take it around to the back door and we'll take it around there." Mr. Edwards drove his truck to the back gate, found it locked, waited five minutes and left again. Following a second telephone call, and with his suspicions aroused, he returned to the Fiberglass and Sports place of business and found the officers already there. Mr. Edwards identified the defendant as the man he saw on that occasion.

In response to a call, Detective Moore with the Wilson Police Department went to Fiberglass and Sports and found Mrs. Ferguson sitting in a chair crying and sobbing. Her clothing and her hair were in disarray. She said she had been raped by a black man and described him as young, no beard or moustache, with uncombed and unkempt hair but not an Afro, and about as tall and heavy as Detective Moore.

A day or two thereafter, Detective Moore gave Mrs. Ferguson a stack of twelve black and white photographs of black males and requested her to examine them to see if she recognized her assailant from any of the photographs. She took the stack and laid them aside one by one, faceup, "and when she got to the photograph of Ernest John Vinson, she said, 'That's the man.' " Mrs. Ferguson positively identified defendant as her assailant.

Defendant did not testify. His only witness was Dr. Eugene V. Maynard, a psychiatrist and a former Regional Director of Forensic Psychiatry at Cherry Hospital in Goldsboro. Dr. Maynard testified that he examined and observed the defendant in December 1973 and performed a series of tests; that it was his diagnosis that defendant was suffering from mental retarda-

tion, with an I.Q. of 76 and a mental age of approximately fifteen or sixteen years, and that defendant had an antisocial personality. Dr. Maynard further stated that defendant said he was suffering from drug dependence from all known varieties of drugs. "In a psychiatric evaluation, you largely have to go by what the patient tells you. You don't see him take the drugs."

On cross-examination, Dr. Maynard said: "When I stated that the defendant had antisocial personality, that is a relatively new term. It used to be known as psychopathic personality. The psychopath personality is the type of individual who we feel has a very limited, if any, conscience. They are given to committing acts of an illegal nature without any concern for the consequences, without concern for the present. They have no close ties or affiliations with any other people. They are given to acts of violence off times [sic] without any qualms of conscience or concern for the consequences." With reference to drug addiction, Dr. Maynard stated that while defendant was at Cherry Hospital he showed no signs of drug withdrawal and that it had not been necessary to treat defendant with any type of drugs while he was there. Dr. Maynard had no opinion as to whether defendant was dependent on drugs.

The jury convicted defendant of rape and he was sentenced to death. He appealed to this Court assigning errors noted in the opinion.

*Rufus L. Edmisten, Attorney General, by Claude W. Harris and Charles M. Hensey, Assistant Attorneys General, for the State of North Carolina.*

*Robert A. Farris, Attorney for defendant appellant.*

HUSKINS, Justice.

[1]  A prospective juror stated on her voir dire examination that under no circumstances and regardless of the evidence would she return a verdict of guilty if it meant imposition of the death penalty. She was excused for cause, and defendant assigns error on that ground.

There is no merit in this assignment. The juror was properly excused for cause. *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975) ; *State v. Ward,* 286 N.C. 304, 210 S.E. 2d 407 (1974) ; *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844 (1974) ; *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974).

State v. Vinson

[2] During jury selection the following proceedings were held in chambers with only the defendant and his counsel, the district attorney, the clerk, the court reporter and the judge present:

"After nine (9) jurors had been seated, it was brought to the attention of the Court that some of the names of the jurors from the jury panel drawn at random from a box had been in fact drawn by a deputy sheriff, rather than the clerk. The court directs that all of the jurors who had been seated both by the defendant and the State shall be returned to the panel. All jurors who had been challenged by the State or the defendant are removed from the panel. The trial shall proceed and the selection of the jury shall begin anew, with the defendant to be allowed a total of fourteen (14) challenges, in addition to any challenges heretofore exercised and the State is allowed a total of nine (9) challenges in addition to any challenges heretofore exercised. The clerk is directed to return the names of all the jurors who had been passed by the State and the defendant and all remaining jurors in the original panel to the box to be selected and called at random by the clerk. This finding and order was entered in the presence of the defendant and in the presence of his counsel and the solicitor out of the presence of the jury. To the foregoing procedure the defendant through his counsel consents; also the solicitor."

DEFENDANT'S EXCEPTION NO. 3

Defendant assigns the foregoing proceedings as error for that (1) the nine jurors seated had been drawn by a deputy sheriff "in abrogation of N.C.G.S. § 9-5" and (2) the court awarded the State nine challenges in addition to the peremptory challenges it had already exercised, a violation of G.S. 9-21. Defendant says the statute forbids such an expansion "even by a purported consent."

It should be observed at the outset that G.S. 9-5 prescribes the procedure for drawing the panel of jurors from the jury box at least thirty days prior to the session of court in which they shall serve. It has no application in the context of this episode.

The quotation above set out is all the record contains concerning this assignment. It is apparent, however, that a jury panel was drawn by the clerk or his assistant or deputy as re-

quired by G.S. 9-5 and that all jurors so drawn had been summoned and had reported for jury duty. Preparatory to selection of a jury in this case the names of the entire panel had been placed on separate scrolls or slips of paper and placed in a hat or box (not the jury box) from which names were drawn at random for interrogation concerning their fitness to serve as jurors. It was this drawing in which some of the names were in fact drawn by a deputy sheriff rather than the clerk. When this fact was brought to the attention of the able trial judge, he, in his discretion, adopted the procedure heretofore set out. We see no error and no prejudice in the action taken.

We find no language in Chapter 9 of the General Statutes which requires the clerk of the court personally, or through an assistant or deputy clerk, to make the random drawing of the names of those on the panel from a hat or box so as to render illegal such drawing by someone else. Be that as it may, the trial judge, in an abundance of caution, nullified the proceedings and started anew, returning to the hat or box from which drawn the names of the nine jurors already accepted by both sides and discarding the names of all jurors already challenged successfully by either party. The judge then announced that defendant would have fourteen peremptory challenges and the State would have nine, the maximum allowed by G.S. 9-21(a) and (b), completely disregarding any peremptory challenges either the State or the defendant may have exercised theretofore. This demonstration of fairness should be commended, not condemned. *State v. Harris,* 283 N.C. 46, 194 S.E. 2d 796, *cert. denied* 414 U.S. 850, 38 L.Ed. 2d 99, 94 S.Ct. 143 (1973). The record does not disclose how many peremptory challenges, if any, were used by defendant or the State. We perceive no possible prejudice to defendant.

The trial judge is empowered and authorized to regulate and supervise the selection of the jury to the end that both defendant and the State receive the benefit of a trial by a fair and impartial jury. *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969), *rev'd as to death penalty* 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2283 (1971). Defendant has shown no prejudicial error. This assignment is overruled.

Defendant's second assignment is based on Exceptions Nos. 2, 4, 5, 6, 7, 8, 9, 10 and 11 relating to the voir dire examination of veniremen during the selection of the jury.

The following reproductions serve to illustrate the points defendant seeks to raise:

DEFENSE COUNSEL: "Mr. Jernigan, if it was shown to your satisfaction that the defendant couldn't control his actions and didn't know what was going on at the time of this indictment, would you still be inclined to return a verdict which would cause the imposition of the death sentence?"

OBJECTION SUSTAINED. DEFENDANT'S EXCEPTION NO. 2

DEFENSE COUNSEL: " . . . Now, as I understand it, everyone on the jury is in favor of capital punishment and is in favor of that punishment for this offense. Now, is there anyone on the jury, because of the nature of the offense, feels like you might be a little bit biased or prejudiced, either consciously or unconsciously, because of the type or the nature of the offense involved; is there anyone on the jury who feels that they would be in favor of sentence other than death for the offense of rape?"

OBJECTION SUSTAINED. DEFENDANT'S EXCEPTION NO. 4

DEFENSE COUNSEL: "Now, is there, Mrs. Rouse, can you think of any circumstance or any set of facts in which a defendant is charged and convicted of rape, that you would not be in favor of the death penalty?"

OBJECTION SUSTAINED. DEFENDANT'S EXCEPTION NO. 5

DEFENSE COUNSEL: "If you are satisfied from the evidence that the defendant was not conscious of his act at the time it allegedly was committed, would you still feel compelled to return a verdict of guilty?"

OBJECTION SUSTAINED. DEFENDANT'S EXCEPTION NO. 6

DEFENSE COUNSEL: "Well, if you are satisfied from the evidence, that a person did not intentionally or wilfully commit the act in question, would you still return a verdict, if you were satisfied from the evidence, beyond a reasonable doubt, that the act was committed, would you still return a verdict of guilty knowing that the sentence would be a mandatory death sentence?"

OBJECTION SUSTAINED. DEFENDANT'S EXCEPTION NO. 7

DEFENSE COUNSEL: "Well, in other words, Mr. Ash, are you saying that even if you are satisfied that the de-

fendant did not know right from wrong, you might still return a verdict that would cause him to be sentenced to the gas chamber?"

OBJECTION SUSTAINED. DEFENDANT'S EXCEPTION NO. 8

DEFENSE COUNSEL: "Well, Mr. Ash, if you are satisfied from the evidence, that at the time of the purported offense, that the defendant did not know right from wrong, would you still return a verdict of guilty, knowing as you now know what the punishment would be?"

OBJECTION SUSTAINED. DEFENDANT'S EXCEPTION NO. 9

COURT: "He has answered the question. Isn't that true, sir, that you said you didn't know how to answer that question?"                DEFENDANT'S EXCEPTION NO. 10

DEFENSE COUNSEL: "Mr. Ash, is there any reason that hasn't been asked of you, why you would not give the defendant the benefit of the rule that would require him to know right from wrong before he would be guilty?"

OBJECTION SUSTAINED. DEFENDANT'S EXCEPTION NO. 11

Defendant states in his brief that Exceptions Nos. 4 and 5 "involve a question, first to the entire panel, and then to an individual juror as to their beliefs and attitudes concerning capital punishment for the crime charged. . . . The remainder of the questions to which his Honor sustained objections by the solicitor involved defendant's effort to perceive whether prospective jurors would accept an insanity defense." Defendant contends the inquiries were proper for those purposes and exclusion of them by the court constitutes prejudicial error.

"In selecting the jury, the court, or any party to an action, civil or criminal, has the right to make inquiry as to the fitness and competency of any person to serve as a juror." *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833 (1969). We pointed out in *Allred* that the voir dire examination of jurors has a double purpose: (1) to ascertain whether grounds exist for challenge for cause and (2) to enable counsel to exercise intelligently the peremptory challenges allowed by law. "The presiding judge shall decide all questions as to the competency of jurors." G.S. 9-14 (1969). His ruling on such questions is not subject to appellate review unless accompanied by some imputed error of

law. *State v. Harris,* 283 N.C. 46, 194 S.E. 2d 796, *cert. denied* 414 U.S. 850, 38 L.Ed. 2d 99, 94 S.Ct. 143 (1973).

[3] We said in *State v. English,* 164 N.C. 498, 80 S.E. 72 (1913) : "The right of challenge is not one to accept, but to reject. It is not given for the purpose of enabling the defendant, or the State, to pick a jury, but to secure an impartial one." Challenges for cause are without limit if cause is shown, while peremptory challenges may be exercised within the limits allowed by law. *State v. McKethan,* 269 N.C. 81, 152 S.E. 2d 341 (1967).

[4] While a wide latitude is allowed counsel in examining jurors on voir dire, the form of the questions is within the sound discretion of the court. "In this jurisdiction counsel's exercise of the right to inquire into the fitness of jurors is subject to the trial judge's close supervision. The regulation of the manner and the extent of the inquiry rests largely in the trial judge's discretion. [Citation omitted.] The overwhelming majority of the states follow this rule." *State v. Bryant,* 282 N.C. 92, 191 S.E. 2d 745 (1972), *cert. denied* 410 U.S. 987, 36 L.Ed. 2d 184, 93 S.Ct. 1516 (1973) ; *accord, State v. Carey,* 285 N.C. 497, 206 S.E. 2d 213 (1974).

[5, 6] On the voir dire examination of prospective jurors, hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed. Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts. In the first place, such questions are confusing to the average juror who at that stage of the trial has heard no evidence and has not been instructed on the applicable law. More importantly, such questions tend to "stake out" the juror and cause him to pledge himself to a future course of action. This the law neither contemplates nor permits. The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts. 47 Am. Jur. 2d, Jury, § 203 (1969) ; *see Christianson v. United States,* 290 F. 962 (6th Cir. 1923) ; *Sherman v. William M. Ryan & Sons, Inc.,* 126 Conn. 574, 13 A. 2d 134 (1940) ; *Pope v. State,* 84 Fla. 428, 94 So. 865 (1922) ; *State v. Henry,* 197 La. 999, 3 So. 2d 104 (1941) ; *State v. Pinkston,* 336 Mo. 614, 79 S.W. 2d 1046

State v. Vinson

(1935) ; *State v. Bryant, supra; State v. Huffman,* 86 Ohio St. 229, 99 N.E. 295 (1912).

Types of questions which have been considered improper include "those asking a juror what his verdict would be if the evidence were evenly balanced; if he had a reasonable doubt of a defendant's guilt; if he were convinced beyond a reasonable doubt of a defendant's guilt; or questions asking him whether he would, in a specified hypothetical situation, vote in favor of the death penalty. . . . Also, it has been considered improper to ask jurors hpothetical questions concerning issues, especially certain criminal defenses, which may never be raised at the trial." 47 Am. Jur. 2d, Jury, § 203 (1969) ; *see Proctor v. People,* 101 Colo. 163, 71 P. 2d 806 (1937) ; *Commonwealth v. Calhoun,* 238 Pa. 474, 86 A. 472 (1913) ; Annot., Jury—Voir Dire —Hypothetical Question, 99 A.L.R. 2d 7, 23, § 4[a] (1965).

In *State v. Jackson,* 284 N.C. 321, 200 S.E. 2d 626 (1973), the Court held that the trial judge properly sustained the State's objection to the following question asked by defendant's counsel: "I ask you now collectively if you find from the evidence relating to any or all the facts in this case, in view of all the evidence, that it is susceptible of two reasonable interpretations; that is, one leading to his innocence and one leading to his guilt, I will ask you now if you will adopt that interpretation which points to innocence and reject that of guilt?" There, Justice Branch, speaking for the Court, said: "The hypothetical question posed in instant case could not reasonably be expected to result in an answer bearing upon a juror's qualifications. Rather it could well tend to commit, influence or ask the jury for a decision in advance of hearing all of the testimony." *See also State v. Bryant, supra; State v. Washington,* 283 N.C. 175, 195 S.E. 2d 534 (1973), *cert. denied* 414 U.S. 1132, 38 L.Ed. 2d 757, 94 S.Ct. 873 (1974).

In applying the foregoing principles to this case, we first focus on Exceptions Nos. 4 and 5 relating to the jurors' "beliefs and attitudes concerning capital punishment for the crime charged." The defendant's right of inquiry in this regard is the right to make *appropriate* inquiry concerning a prospective juror's moral or religious scruples, beliefs and attitudes toward capital punishment. *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974). "The extent of the inquiries, of course, is subject to the control and supervision of the trial judge." *State v. Carey,* 285 N.C. 497, 206 S.E. 213 (1974).

[7] With reference to Exception No. 4, we first note the question was premised on the statement that "everyone on the jury is in favor of capital punishment and is in favor of that punishment for this offense." Such an assumption is not supported by the record before us. Secondly, the question contains two sub-questions dealing with different points of inquiry. This form makes the question inherently ambiguous and totally confusing to prospective jurors. Therefore, the question was properly rejected.

[8] In regard to Exception No. 5, defense counsel sought to elicit information concerning *any* circumstances or set of facts which would mitigate the juror's views on the death penalty in a rape case. The question could not reasonably be expected to elicit information bearing upon the juror's qualifications and a consequential challenge for cause, and was overly broad for the purpose of eliciting information relevant to the exercise of a peremptory challenge. No prospective juror should be required to answer questions of such scope and generality. *State v. Washington, supra.* The question exceeded the bounds of propriety and was properly disallowed.

Defendant further contends that the exclusion of the questions noted by Exceptions Nos. 2 and 6-11 denied him the right to inquire "whether prospective jurors would accept an insanity defense." While in certain cases appropriate inquiry may be made in regard to whether a juror is prejudiced against the defense of insanity, we have carefully reviewed defendant's contentions under the circumstances here presented and find that the trial judge properly exercised his discretion. *See United States v. Cockerham,* 476 F. 2d 542 (D.C. Cir. 1973); Annot., Jury—Voir Dire—Hypothetical Question, 99 A.L.R. 2d 7, 23 n. 15 (1965); Annot., Juror—Prejudice Against Defense, 112 A.L.R. 531 (1938).

[9] With reference to Exceptions Nos. 2, 6 and 7, we note the questions relate to hypothetical circumstances in which defendant "couldn't control his actions," "was not conscious of his act" or "did not intentionally or wilfully commit the act." The law relating to and distinguishing the defense of insanity and the defense of unconsciousness has been fully discussed by this Court in *State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305 (1975), and *State v. Caddell,* 287 N.C. ____, ____ S.E. 2d ____ (1975). Suffice it to say that the questions propounded by defense counsel here were manifestly confusing, contained in-

adequate statements of the law, and were properly excluded. *State v. Bryant, supra.*

[10] Exceptions Nos. 8, 9 and 11 relate to the examination of Mr. Ash, a prospective juror who, for reasons which this record fails to disclose, was not a member of the jury finally empaneled. The remaining exception, No. 10, concerns the trial court's statement that Mr. Ash had answered the question propounded by defense counsel. Nothing else appears in this fragmentary record concerning the examination and answers of this prospective juror. We assume the trial court was correct in its observation that the juror had indicated he "didn't know how to answer that question." That being the case, the trial court properly limited further repetitious questions concerning the hypothetical defense of insanity. *State v. Bryant, supra; Grizzell .v. State,* 164 Tex. Crim. 362, 298 S.W. 2d 816 (1956).

Moreover, since Mr. Ash did not serve on the jury in this case, we perceive no possible prejudice to defendant. The record does not show why or at whose instance he was excused. Lack of prejudice is further accentuated by the fact that the evidence offered at the trial was wholly insufficient to raise the defenses of insanity or unconsciousness and require the trial judge to charge the jury on legal principles applicable thereto.

We find no merit in any of the exceptions upon which defendant's second assignment is based. The assignment is therefore overruled.

In his next contention, based on assignments three, four and six, defendant argues the trial court erred in admitting improper evidence over his objection and in excluding competent evidence elicited by him at trial.

[11, 12] Assignments three and four, relating to the testimony of Detective Moore, are patently without merit. The testimony of this witness in regard to what Mr. Ferguson had told him during his investigation of the incident clearly corroborates the previous testimony of Mrs. Ferguson and was admissible for that purpose. *State v. Cook,* 280 N.C. 642, 187 S.E. 2d 104 (1972) ; *State v. Rose,* 251 N.C. 281, 111 S.E. 2d 311 (1959). Furthermore, it is settled that Mrs. Ferguson's use of the word "rape" during that investigation did not constitute an opinion on a question of law. *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190 (1968). Similarly, there is no merit to the argument that the trial court erred in admitting *without a voir dire examina-*

*tion* the testimony of this witness concerning Mrs. Ferguson's identification of a photograph of defendant prior to trial. Mrs. Ferguson on direct examination had already made an in-court identification of defendant and on cross-examination she gave explicit testimony of the pretrial identification, all without objection or a request for a voir dire examination. Moreover, there is nothing whatever in the record suggesting this pretrial procedure was conducted in an impermissibly suggestive manner. Under these circumstances a voir dire examination was not necessary, especially since one was not requested at the time objection was made to the testimony of Detective Moore. *State v. Cook, supra; State v. Blackwell,* 276 N.C. 714, 174 S.E. 2d 534, *cert. denied* 400 U.S. 946, 27 L.Ed. 2d 252, 91 S.Ct. 253 (1970).

Assignment six is based upon five exceptions, Nos. 16-20, to the trial court's rulings on certain aspects of Dr. Maynard's testimony.

[13]   Exception No. 16 is directed to the trial court's action in sustaining the State's objection to the following question: "At any time in your conference with him, did the defendant indicate any knowledge to the crime for which he has been charged?" Out of the presence of the jury Dr. Maynard testified that defendant professed no knowledge of any crime of rape. Defendant does not disclose the relevancy of this inquiry and we do not perceive any legitimate purpose. The question called for inadmissible hearsay and the doctor's answer, stating what defendant had declared after he had been charged with this crime, was of that nature. Defendant did not take the stand and his self-serving declarations to the doctor were not admissible for any purpose. *State v. Taylor,* 280 N.C. 273, 185 S.E. 2d 677 (1972). The State's objection was properly sustained.

[14]   Exceptions Nos. 17 and 18 relate to the trial court's action in sustaining the State's objections during direct examination to questions concerning Dr. Maynard's opinion as to the extent of drug use by defendant. Our perusal of the record indicates that on redirect examination defense counsel was permitted to ask Dr. Maynard if he had an opinion "whether or not the defendant was dependent on drugs?" In response thereto the witness answered: "I have no opinion. I have a copy of a report on Ernest Vinson. On page 3, number 3, under diagnosis it reads 'drug dependence, all known varieties. . . . ' This is

the current diagnosis." Even assuming error on direct examination, which we do not concede, we perceive no possible prejudice since substantially the same question was asked and answered on redirect.

[15] We find no merit in Exceptions Nos. 19 and 20 which deal with answers of the doctor on cross-examination to questions concerning the course of treatment of defendant. The questions and answers were pertinent to matters covered on direct examination and were obviously admissible. *State v. Stone,* 226 N.C. 97, 36 S.E. 2d 704 (1946) ; *State v. Perry,* 210 N.C. 796, 188 S.E. 639 (1936).

Assignments three, four and six, therefore, are overruled.

[16] In assignment five defendant contends the trial court erred in denying his motion as of nonsuit at the close of the State's evidence. We find no merit in this assignment. The testimony of the prosecuting witness contains plenary evidence which tends to show, when taken in the light most favorable to the State, that defendant had intercourse with her by force and against her will. Accordingly, defendant's motion as of nonsuit was properly overruled. *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975) ; *State v. Arnold,* 284 N.C. 41, 199 S.E. 2d 423 (1973).

The seventh assignment, based on Exceptions Nos. 22 through 25, asserts error by the trial court in instructing the jury.

[17] Defendant's Exception No. 22 is that the trial court failed to define the term "sexual intercourse" and thus failed to charge that rape requires penetration by the male organ. The court charged: "Rape is forcible sexual intercourse with a woman, against her will. For you to find defendant guilty of rape, the State must satisfy you from the evidence and beyond a reasonable doubt of three things. First, that the defendant, Ernest John Vinson had sexual intercourse with the alleged victim, Norma Coleen Ferguson," etc.

The law defines rape as the carnal knowledge of a female person by force and against her will. G.S. 14-21 (1969) ; *State v. Armstrong,* 287 N.C. 60, 212 S.E. 2d 894 (1975). "The terms 'carnal knowledge' and 'sexual intercourse' are synonymous. There is 'carnal knowledge' or 'sexual intercourse' in a legal sense if there is the slightest penetration of the sexual organ

of the female by the sexual organ of the male." *State v. Murry,* 277 N.C. 197, 176 S.E. 2d 738 (1970) ; *State v. Jones,* 249 N.C. 134, 105 S.E. 2d 513 (1958). In this respect the law does not require any particular phraseology in stating that the defendant had carnal knowledge of the complaining witness. *State v. Hodges,* 61 N.C. 231 (1867). Accordingly, in *State v. Bowman,* 232 N.C. 374, 61 S.E. 2d 107 (1950), this Court held that testimony of a complaining witness that defendant had "intercourse" with her was sufficient to warrant a finding by the jury that there was penetration of her private parts. *Accord, State v. Hardee,* 6 N.C. App. 147, 169 S.E. 2d 533 (1969). It necessarily follows that the term "sexual intercourse" encompasses actual penetration. *Williams v. State,* 92 Fla. 125, 109 So. 305 (1926) ; *Teynor v. State,* 47 Ohio App. 149, 191 N.E. 372 (1933).

We are of the opinion that the instructions sufficiently relate the law of rape to the evidence presented. Here, all the State's evidence clearly points to two completed acts of penetration. The complaining witness testified "he actually penetrated me and had intercourse with me." There was no evidence to the contrary. Although defendant's plea of not guilty required the State to prove penetration beyond a reasonable doubt, the defense was not grounded on lack of penetration. Under these circumstances, the term "sexual intercourse" conveyed the idea of completed intercourse, including actual penetration, and the jury must have so understood. Moreover, the Court asked defense counsel if the instructions were satisfactory and counsel replied "quite" and indicated no corrections or additions were necessary. If he desired further elaboration on the term "sexual intercourse" he should have so requested at that time. Of course the trial court must charge on all substantial features of a case which arise upon the evidence even absent a special request for such instruction. *State v. Deck,* 285 N.C. 209, 203 S.E. 2d 830 (1974) ; *State v. Dooley,* 285 N.C. 158, 203 S.E. 2d 815 (1974). Conversely, when the trial court has aptly instructed on all substantial features of the case, a defendant desiring a more detailed instruction as to any subordinate matter should make an appropriate request. *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *State v. Gordon,* 224 N.C. 304, 30 S.E. 2d 43 (1944) ; *State v. Hendricks,* 207 N.C. 873, 178 S.E. 557 (1935) ; *State v. O'Neal,* 187 N.C. 22, 120 S.E. 817 (1924).

[18] Exception No. 23, directed to the trial court's failure to instruct the jury to consider the "lack of evidence" as well as the

evidence in the case, is without merit. Defendant cites *State v. Hammonds,* 241 N.C. 226, 85 S.E. 2d 133 (1954), and *State v. Tyndall,* 230 N.C. 174, 52 S.E. 2d 272 (1949), in support of this exception. Both of those cases stand for the proposition that when the court undertakes to define the term "beyond a reasonable doubt," the definition must be in substantial accord with those approved by this Court. In this case the trial court's instructions on reasonable doubt were in substantial accord with the charge which we approved in *State v. Gaiten,* 277 N.C. 236, 176 S.E. 2d 778 (1970). Here, as in *Gaiten,* the evidence was not circumstantial, but was direct and amply sufficient to support the verdict. Accordingly, *Gaiten* controls and the court's instructions as to reasonable doubt were adequate under our decision in that case. *See also State v. Britt,* 270 N.C. 416, 154 S.E. 2d 519 (1967).

[19] In Exceptions Nos. 24 and 25 defendant argues the court did not charge "on the required mental capacity to commit a criminal offense" or "on the legal consequences if the jury found that the defendant did not know right from wrong at the time of the alleged offense." A request for the desired instructions does not appear in the record. Moreover, defendant did not make a formal plea of insanity and there is no evidence in the record tending to show that he was insane or lacked requisite mental capacity to commit the crime. Evidence of low mentality in itself is not sufficient to raise a defense to a criminal charge. *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345 (1969), *cert. denied* 396 U.S. 1024, 24 L.Ed. 2d 518, 90 S.Ct. 599 (1970). Under these facts there was insufficient evidence to require a charge on insanity or lack of mental capacity, and there was no error in the court's failure to do so. *State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305 (1975) ; *State v. Melvin,* 219 N.C. 538, 14 S.E. 2d 528 (1941) ; *State v. Miller,* 219 N.C. 514, 14 S.E. 2d 522 (1941).

This assignment is overruled.

[20] Finally, defendant contends that imposition of the death penalty in this case constitutes cruel and unusual punishment. This contention has heretofore been considered and determined to be without merit in various cases. *State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335 (1975) ; *State v. Armstrong,* 287 N.C. 60, 212 S.E. 2d 894 (1975), and cases cited therein. Therefore, defendant's eighth assignment based on this contention is overruled.

After careful review of all assignments, we find no prejudicial error in the trial. The verdict and judgment must therefore be upheld.

No error.

Chief Justice SHARP dissenting as to the death sentence:

The rape for which defendant has been convicted occurred on 5 December 1973, a date during the period between 18 January 1973, the day of the decision in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly rewrote G.S. 14-21 by the enactment of Chapter 1201 of the Session Laws of 1973. For the reasons stated in the dissenting opinion in *State v. Jarrette*, 284 N.C. 625, 666 *et seq.*, 200 S.E. 2d 721, 747 *et seq.* (1974), I dissent as to the death sentence imposed upon defendant by the court below and vote to remand for the imposition of a sentence of life imprisonment.

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams*, 286 N.C. 422, 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams*, 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975).